[No. A071025. First Dist., Div. One. Jan. 27, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE F. FALCK, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the parts in brackets in the first paragraph and parts III and IV.

## COUNSEL

Gail Harper, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, and Ronald A. Bass, Assistant Attorney General, for Plaintiff and Respondent.

## OPINION

**STEIN, J.**—Appellant George F. Falck stands convicted of stalking, a violation of Penal Code section 646.9, subdivision (a).[1] Appellant contends on appeal that the term "safety" set forth in the statute is unconstitutionally vague and overbroad. He further raises issues of the sufficiency of the

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

At the time appellant committed the acts at issue here, former section 646.9, as applicable here, provided:

"(a) Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family, is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison.

" 
. . . . . . . . . . . . . . . . . . . . . . . . . . .

"(d) For purposes of this section, 'harasses' means a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person. 'Course of conduct' means a pattern of conduct composed of

evidence to support his conviction [/].* We reject the contention[/]* of unconstitutionality [/].* We find that the evidence is sufficient to support appellant's conviction[/],* and accordingly affirm the judgment.

FACTS

Appellant has been diagnosed as suffering from schizophrenia. His ability to control his impulses is reduced unless he receives and takes antipsychotic medication. Although appellant graduated from college, received an M.B.A. and served in the army, receiving an honorable discharge, he has been unable to obtain employment since 1978 or 1979, apparently declining into homelessness until 1982 or 1983 when he was given a place to sleep by the Resurrection Lutheran Church.

In 1982, when appellant was 35 or 36, he began to frequent a Nation's Hamburgers restaurant. There he noticed, and became fixated with, a 19-year-old woman working at the restaurant. He sent her 12 black roses. One or two days later he began to send her letters at the restaurant, identifying himself as George Frederick and writing about astrology and how they were meant to be together for eternity. Appellant sent the victim two or three letters a day. The manager of the restaurant told appellant he would be arrested if he came into the restaurant again. Appellant did go into the restaurant again, the police were called, and appellant was arrested. Appellant was put on six months' court probation and ordered to stay away from the victim.

For 12 years appellant almost managed to comply with this admonition, although he did not cease thinking about the victim. He obtained a copy of her birth certificate. He obtained some pictures of her from her high school yearbook. He learned from county records that she had married. He tried to call her at two different telephone numbers over this period of time, but was unsure if she was the person who answered the telephone. In November 1994, appellant stopped taking the medication prescribed for his mental

a series of acts over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.'

"(e) For purposes of this section, 'credible threat' means a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent and the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family. The present incarceration of a person making the threat shall not be a bar to prosecution under this section.

" . . . . . . . . . . . . . . . . . . . . . .

"(i) For purposes of this section, 'immediate family' means any spouse, parent, child, . . ."

*See footnote, *ante,* page 287.

condition, and shortly thereafter embarked on the course of conduct leading to the charges filed against him in this case.[2] Appellant explained at trial that he believed that if he had been able to continue seeing the victim in 1982 they would have married. He believes that astrology is God's system for creating different types of people. In late 1994 to early 1995, his study of astrology and the movement of the planets convinced him that the time was right to try again to get together with the victim. He felt that it was nearly imperative that he contact her.

Appellant telephoned the victim at her home in January 1995, identifying himself as "George Frederick," and stating: "I found you. I can tell by your voice." The victim hung up immediately and called the police. Appellant called again. The victim's husband answered, but disguised his voice as the victim's. Appellant, believing himself to be talking to the victim, said that they were deemed by God to be together forever, and spoke about astrology. The victim's husband identified himself, telling appellant not to call again. Appellant called the next morning, again reaching the victim's husband. The husband told appellant that a police report had been filed. The victim and her husband changed their telephone number. The victim received no further calls from appellant. She began, however, to receive letters from him. Appellant sent the victim pictures of her and pictures of himself. He sent her pornographic pictures cut from a magazine, putting captions on them explaining that they were intended to represent the victim. Appellant's letters were sprinkled with astrological references, with discussions of the sexual acts appellant wished to experience with the victim and his anticipation of their impending marriage. In addition, appellant placed a personal advertisement in the newspaper, which the victim read, that recited that appellant had to contact her, that he loved her and had to find her and that he wanted to marry her.

Appellant was arrested on February 3, 1995. The police searched his apartment. They found pictures of the victim in various places. They found written notes referring to astrological matters linking appellant's name to the victim's. One of the notes referred to the date March 21, 1982. Appellant told the police that March 21, 1982, was the date he and the victim were married. Some of the notes referred to the victim by her first name and appellant's last name. The police also found Hustler magazines, some with cut-out spaces corresponding to the pictures sent to the victim, and a copy of the advertisement placed by appellant in the newspaper. At a police interview following his arrest, appellant openly discussed his obsession with the

---

[2]Appellant apparently had been receiving medication through a community health center, but attempted to obtain it through the Veterans' Administration. When that proved difficult, he stopped taking the medication.

victim. Appellant's statements were coherent but rambling. He discussed the victim, astrology, his need to be dominated sexually, his past, his illness, and his intention to marry the victim. He explained that he had obtained the victim's pictures from high school yearbooks obtained at the library. He stated that he could not keep away from the victim, and asked the interviewing officer to take him to the victim or at least to give her his telephone number.

By the time of the trial, appellant was again taking medication. He told the jury that he never had intended to cause any harm to the victim or to frighten her. He had wanted to marry her, but had no intention of forcing her to marry him. He stated that his interest in the victim had faded, and that he no longer was in love with her or wanted to marry her.

DISCUSSION

I.

*Constitutionality of Section 646.9*

■ California's high court recently summarized the relevant legal principles: "The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution, each guarantee that no person shall be deprived of life, liberty, or property without due process of law. This constitutional command requires 'a reasonable degree of certainty in legislation, especially in the criminal law . . . .' (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].) '[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' (*Kolender* v. *Lawson* (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 908-909, 103 S.Ct. 1855]; see also *Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 269 [198 Cal.Rptr. 145, 673 P.2d 732].)

"It is established that in order for a criminal statute to satisfy the dictates of due process, two requirements must be met. First, the provision must be definite enough to provide a standard of conduct for those whose activities are proscribed. (*People* v. *Superior Court (Caswell)* (1988) 46 Cal.3d 381, 389 [250 Cal.Rptr. 515, 758 P.2d 1046]; see also *Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 141 [253 Cal.Rptr. 1, 763 P.2d 852].) Because we assume that individuals are free to choose between lawful and unlawful conduct, 'we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may

act accordingly. Vague laws trap the innocent by not providing fair warning.' (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108 [33 L.Ed.2d 222, 227, 92 S.Ct. 2294]; see *Cranston* v. *City of Richmond* (1985) 40 Cal.3d 755, 763 [221 Cal.Rptr. 779, 710 P.2d 845].)

"Second, the statute must provide definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. (*People* v. *Superior Court (Caswell)*, *supra*, 46 Cal.3d at p. 390; *Burg* v. *Municipal Court*, *supra*, 35 Cal.3d 257, 269.) When the Legislature fails to provide such guidelines, the mere existence of a criminal statute may permit ' "a standardless sweep" ' that allows police officers, prosecutors and juries ' "to pursue their personal predilections." ' (*Kolender* v. *Lawson*, *supra*, 461 U.S. at p. 358 [75 L.Ed.2d at pp. 909-910], quoting *Smith* v. *Goguen* (1973) 415 U.S. 566, 575 [39 L.Ed.2d 605, 613, 94 S.Ct. 1242]; *Walker* v. *Superior Court*, *supra*, 47 Cal.3d at p. 142.)" (*People* v. *Heitzman* (1994) 9 Cal.4th 189, 199-200 [37 Cal.Rptr.2d 236, 886 P.2d 1229].)

Section 646.9 has withstood constitutional challenge for its inclusion of the term "repeatedly." (*People* v. *Heilman* (1994) 25 Cal.App.4th 391, 400-401 [30 Cal.Rptr.2d 422].) It also has been found that the terms "harasses" and "credible threat" are sufficiently defined by the statute, and that the terms "willfully" and "maliciously" are sufficiently definite. (*People* v. *McClelland* (1996) 42 Cal.App.4th 144, 151 [49 Cal.Rptr.2d 587].) ▉ Appellant here challenges the term "safety," present in the phrase "Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her *safety*, or the *safety* of his or her immediate family, is guilty of the crime of stalking."[3] (§ 646.9, subd. (a), italics added.) Appellant points out that the term is not defined by the statute and argues that it has no clear definition, citing The Random House Dictionary of the English Language (1969), page 1259, which defines the term as the state of being safe; freedom from the occurrence of risk of injury, danger, or loss. In appellant's opinion, such a definition is no real definition at all.

It is not, however, necessary that a term be defined by statute, or even that it have a precise dictionary definition. ▉ "[R]equisite standards of certainty can [often] be fleshed out from otherwise vague statutory language by reference to any of the following sources: (1) long established or commonly

---

[3]Prior to 1994, this provision made punishable the making of a credible threat "with the intent to place that person in reasonable fear of *death or great bodily injury* or to place that person in reasonable fear of the *death or great bodily injury* of his or her immediate family." (§ 646.9, former subd. (a), italics added.)

accepted usage; (2) usage at common law; (3) judicial interpretations of the statutory language or of similar language; (4) legislative history or purpose. [Citation.]" (*Sechrist* v. *Municipal Court* (1976) 64 Cal.App.3d 737, 745 [134 Cal.Rptr. 733].) The court in *In re Joseph G.* (1970) 7 Cal.App.3d 695 [87 Cal.Rptr. 25] considered the term "safety" as set forth in section 647, a statute that defines disorderly conduct as including a state of intoxication in a public place in such condition that the offender is unable to exercise care for his own *safety* or the *safety* of others. The opinion in that case both recognized that the term has a commonly accepted usage and provided judicial interpretation of the term: "The word 'safety,' as used in Penal Code section 647, subdivision (f), whether related to a defendant himself or to others, . . . has a commonly understood meaning which gives adequate notice of the conduct proscribed. To begin with, there is a clear and understandable dictionary definition of 'safety': '1. Condition of being safe; freedom from danger or hazard. 2. Quality of being devoid of whatever exposes one to danger or harm; safeness.' (Webster's New Collegiate Dict., 1960 ed.) [¶] We find also that the word is used in article I, sections 1 and 4, and article XX, section 21, of the California Constitution. It is used in the Code of Civil Procedure, Labor Code, Public Utilities Code, Harbor[s] and Navigation[s] Code, Business and Professions Code, Public Resources Code, Government Code, Vehicle Code, Elections Code, Education Code, and others. [¶] The point is, the word 'safety' is widely and commonly used, as evidenced by the foregoing catalogue of code and Constitution uses, and it cannot be said that by reason of its use in subdivision (f) of Penal Code section 647 the statute is unconstitutionally vague and uncertain." (*In re Joseph G., supra*, 7 Cal.App.3d at p. 703.)

Appellant also challenges section 646.9 as being unconstitutionally overbroad, arguing that it fails to specify that it prohibits only "true threats," and thus impermissibly prohibits protected speech. (See *Watts* v. *United States* (1969) 394 U.S. 705, 706-707 [89 S.Ct. 1399, 1401, 22 L.Ed.2d 664]; *People* v. *Mirmirani* (1981) 30 Cal.3d 375, 388, fn. 10 [178 Cal.Rptr. 792, 636 P.2d 1130].) There is no question but that a threat made with the intent to carry it out may be prohibited. As mentioned above, it is not, however, necessary that a threat be made with the actual intention to carry out the threatened act in order to be a true threat. As we recognized in *People* v. *Fisher* (1993) 12 Cal.App.4th 1556 [15 Cal.Rptr.2d 889], it has been held that a true threat includes a threat which on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution. (12 Cal.App.4th at p. 1559, citing *United States* v. *Kelner* (2d Cir. 1976) 534 F.2d 1020, 1026-1028 [34 A.L.R.Fed. 767], *U.S.* v. *Kosma* (3d Cir. 1991) 951 F.2d 549, 554-555 and *U.S.* v. *Orozco-Santillan* (9th Cir. 1990) 903 F.2d 1262, 1265-1266 & fn. 3.)

Appellant complains that section 646.9 does not in so many words limit its application to a threat *which on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the persons threatened, as to convey a gravity of purpose and imminent prospect of execution.* There is, however, nothing magic about these words. A similar challenge was made and rejected in *People* v. *Gudger* (1994) 29 Cal.App.4th 310 [34 Cal.Rptr.2d 510], where the defendant was charged with violating section 76, authorizing punishment of " '[e]very person who knowingly and willingly threatens the life of, or threatens serious bodily harm to, any elected state official, exempt appointee of the Governor, or judge, or the immediate family of the official, appointee, or judge, with the specific intent that the statement is to be taken as a threat, and the apparent ability to carry out that threat by any means . . . .' " (29 Cal.App.4th at p. 315.) The court in *Gudger* agreed, as do we, that because statutes such as section 76 (and section 646.9) punish the mere utterance of words and thus have First Amendment implications, they must be narrowly directed only to truly dangerous threats, i.e., those that sometimes are termed "true threats." (29 Cal.App.4th at pp. 316, 318-319.) The *Gudger* court held, however, that it was not necessary that the statute contain the phrase italicized above if the statute makes it clear that it prohibits only threats that are so unambiguous and have such immediacy that they convincingly express an intention of being carried out. (*Id.* at p. 320.) The court concluded that section 76 met this requirement: "The language in section 76 contains two critical elements which combine to satisfy the requirement that only true threats, and not political hyperbole, joking expressions of frustration, or other innocuous and constitutionally protected speech, are punished. The language of section 76 requires, in pertinent part, (1) 'the specific intent that the statement is to be taken as a threat' and (2) 'the apparent ability to carry out that threat by any means.' " (29 Cal.App.4th at p. 320.)

The language of section 646.9 requires, in pertinent part, (1) the intent to place the victim in reasonable fear of his or her safety, and (2) the making of a "credible threat." The intent element of the section is a specific intent element, requiring that the actor embark upon a "course of conduct *intended* to cause someone to fear."[4] As noted above, at the time of appellant's communications to the victim, a "credible threat" was defined as "a verbal or

---

[4]The importance of an intent element was emphasized by the court in *People* v. *Superior Court (Caswell), supra,* 46 Cal.3d at page 391, citing *Hoffman Estates* v. *Flipside, Hoffman Estates* (1982) 455 U.S. 489 [102 S.Ct. 1186, 71 L.Ed.2d 362]: "On a number of occasions, the United States Supreme Court has emphasized the value that a specific intent requirement plays in overcoming the potential vagueness of a statute. As the court noted in *Hoffman Estates, supra,* 455 U.S. at page 499 [71 L.Ed.2d at page 372], 'a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.' "

written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent and the *apparent ability* to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family." By these requirements section 646.9 limited its application to only such threats as pose a danger to society and thus are unprotected by the First Amendment.

We conclude that section 646.9 is neither unconstitutionally vague nor unconstitutionally overbroad.

## II.

### *Sufficiency of the Evidence*

■ Appellant contends that the evidence fails to support the verdict. ■ The question, of course, is not whether there is evidence from which the jury could have reached some other conclusion, but whether, viewing the evidence in the light most favorable to respondent, and presuming in support of the judgment the existence of every fact the trier reasonably could deduce from the evidence, there is substantial evidence of appellant's guilt—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People* v. *Guardado* (1995) 40 Cal.App.4th 757, 761 [47 Cal.Rptr.2d 81].)

■ Appellant here contends that the record is devoid of evidence that he made a "credible threat," or that he made that threat with the intent to place the victim in reasonable fear for her safety or the safety of her immediate family.

### A. *Evidence of Credible Threat*

At the time of appellant's communications with the victim, a "credible threat" was defined as "a verbal or written threat or a threat implied by a pattern of conduct or a combination of verbal or written statements and conduct made with the intent and the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family." (§ 646.9, former subd. (e).) ■ Section 646.9 does not require that the defendant actually intend to carry out the threat. It is enough that the threat causes the victim reasonably to fear for her safety or the safety of her family, and that the accused makes the threat with the intent to cause the victim to feel that

fear. (*People* v. *Carron* (1995) 37 Cal.App.4th 1230, 1238-1240 [44 Cal.Rptr.2d 328].) In addition, in determining whether a threat occurred, the entire factual context, including the surrounding events and the reaction of the listeners, must be considered. (See *U.S.* v. *Orozco-Santillan, supra,* 903 F.2d at p. 1265.)

■ Appellant's communications with the victim were peppered with references to astrology and to appellant's intention of spending eternity with her. Appellant wrote about sexual acts in which he wished to engage with the victim. He sent her pornographic pictures. He wrote such things as, "I need you and want to charge ahead on my RD 350 Yamaha road and street racer into your pussy beginning our eternity of marital bliss as God intended it." In a letter informing her of his lifetime accomplishments he told her that he was very good with an M-16 automatic rifle weapon. In another letter he wrote that he knew she was a "hard woman to handle." He wrote: "You're better off with me, I can heal your wounds. Give me the chance. Please don't be married to anyone but me. God created us for each other." He wrote that the victim was his "only chance to keep from hurting and leaving beautiful women." We have little difficulty in perceiving a credible threat in these letters. They disclose an obsessive desire to engage in sexual acts with the victim. They disclose an obsessive desire to marry her and be with her. The references to eternity and to appellant's proficiency with a rifle reasonably could be construed as an intention to kill the victim and commit suicide so that they might spend eternity together. They can be construed as a threat to kill the victim or her husband if she did not agree to appellant's wishes. It also is relevant that appellant once sent the victim a dozen black roses, a gift with sinister overtones.[5] Appellant made it abundantly clear that his desires took precedence over the victim's wishes. His obsession continued over 12 years notwithstanding that the victim did not know him, had evidenced no desire whatsoever to know him and indeed had taken steps to ensure that he would not contact her. Finally, it is a sad truth, and one commonly reported, that persons such as appellant, in the grips of an obsession, have killed or harmed the object of that obsession, even while maintaining that they have no desire to cause harm. In short, the evidence not just slightly, but overwhelmingly, supports the finding that the victim not only actually feared appellant, but had cause to fear him. Appellant's conduct, accordingly, conveyed a credible threat.

---

[5]Appellant testified that he had ordered white roses. The fact remains, however, that black roses were received, a fact that carries an inference that black roses were ordered notwithstanding appellant's testimony, and provides further justification for the victim's fear of appellant.

**B.** *Evidence That Appellant Intended to Place the Victim in Fear for Her Safety*

Appellant, the only person who had actual knowledge of his intent in communicating with the victim, testified that he had no intention to cause fear in the victim. He claimed that he loved the victim, would never harm her and had no desire to make her afraid. Intent, however, can be inferred from circumstantial evidence. (§ 21, subd. (a).) Indeed, it is recognized that "[t]he element of intent is rarely susceptible of direct proof and must usually be inferred from all the facts and circumstances disclosed by the evidence." (*People* v. *Kuykendall* (1955) 134 Cal.App.2d 642, 645 [285 P.2d 996]; see also *People* v. *Lyles* (1957) 156 Cal.App.2d 482, 486 [319 P.2d 745].) Here, it can be inferred that appellant intended to cause fear in the victim from the fact that he insisted on maintaining contact with her although she clearly was attempting to avoid him, and although he had been warned away by the police, the court and the victim's husband. In addition, appellant's letters were peppered with his desire to engage in sexual acts with the victim, acts which often included elements of bondage or violence. Appellant sent the victim black roses, symbolic of death. He referred to being together with her for eternity. He referred to his prowess with a rifle. All this evidence not only supports the conclusion that the victim feared appellant and had reason to fear him, but also that he acted with the intention of inducing that fear.

Substantial evidence supports the jury's verdict.

### III., IV.*

. . . . . . . . . . . . . . . . . . . . . .

### CONCLUSION

The judgment is affirmed.

Strankman, P. J., and Swager, J., concurred.

A petition for a rehearing was denied February 24, 1997, and appellant's petition for review by the Supreme Court was denied April 16, 1997.

---

*See footnote, *ante*, page 287.