Filed 2/25/13  P. v. Thomas CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B236133 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA087606) |
| v. | |
| RELIUS THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James B. Pierce, Judge.  Affirmed.

George W. Woodworth for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Appellant and defendant Relius Thomas appeals from the judgment following his conviction for stalking and making criminal threats against his ex-girlfriend. He contends that there was insufficient evidence to support the conviction for stalking, that the trial court committed prejudicial misconduct in instructing the jury, and that he received ineffective assistance of counsel. We affirm the judgment.

# FACTUAL AND PROCEDURAL BACKGROUND

*Charges*

Thomas was charged in count 1 with stalking (Pen. Code, § 646.9, subd. (b))[1] and in counts 2-6 with making criminal threats (§ 422). It was further alleged that he had three prior convictions for felonies (§ 1203, subd. (e)(4)), two prior convictions of a serious felony (§ 667, subd. (a)(1)) and four prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

Thomas pled not guilty and denied the special allegations. The case proceeded to jury trial.

*Evidence at Trial*

A. *Prosecution Evidence*

Thomas and Rochelle Goodwin dated on and off for 12 years, until Goodwin ended the relationship in July 2010 due to Thomas's insecurity and threats he made against her. Thomas began telephoning Goodwin and repeatedly showing up at her house. Sometimes he would ask her to get back together with him, and sometimes

---

[1]     All undesignated statutory references are to the Penal Code.

he would cuss her out, call her names, and threaten her. Goodwin changed her phone number.

On October 4, 2010, Thomas came to Goodwin's door and asked to come in. She said no and asked him to leave, and he cussed at her and threatened to get her and kill her, and threw a glass of wine on her face. She was afraid. At this point, Goodwin's adult daughter Cherrell Gayden was approaching the front of the house, and Thomas came towards Gayden as if he was going to attack her. He left when he saw that Goodwin was calling the police. A recording of Goodwin's 911 call was played for the jury, as were subsequent 911 calls. The next day she obtained a restraining order that required Thomas to stay 100 feet away from Goodwin and Gayden. Gayden lived in the duplex behind Goodwin's duplex.

On October 19, 2010, Gayden passed Thomas on the sidewalk near her home. She called 911 because she was scared. On October 26, 2010, Goodwin obtained a permanent restraining order against Thomas that was effective for two years. On October 29, 2010, Gayden saw Thomas sitting near the church that was directly across from her house, and she called 911. That same day, Thomas knocked on Goodwin's door for 45 minutes and accused her of talking to another man. She called 911 again. She had a security alarm system installed.

Sometime in November 2010 Thomas left Goodwin a note at her house that said, "I seen you and your friend. You better call me the next time. You will get it or your house, your car. Call me ASAP. Jail don't care." Goodwin interpreted the note as a threat by Thomas to hurt her.

On November 5, 2010, Gayden and Goodwin saw Thomas hiding behind a cabinet at the end of their driveway. They called 911. Two days later, Goodwin saw Thomas standing on the sidewalk in front of her house. He told her, "I'm going to get you" and called her names. He seemed to be getting angrier with each

3

contact, and she felt afraid and believed he could carry out his threats. Three days later, on November 10, 2010, Goodwin again called 911 after she saw Thomas standing at her front window looking into the house. On November 12, 2010, she saw him parked down the street from her house and called 911.

A neighbor saw Thomas peeking over the fence into Goodwin's property from the property next door. Goodwin set up a booby trap consisting of Christmas bells tied on a swing in the corner of her backyard, so that if Thomas tried to jump over the fence the bells would ring. On November 19, 2010, Gayden heard the bells ring and saw Thomas in the backyard and alerted Goodwin. Thomas called Goodwin a bitch, cussed her out, and threatened, "I'm going to get your bitch ass." He also threatened that he was going to blast her, which she and Gayden interpreted to mean that he was going to shoot her with a gun. They were afraid and called 911. A male voice can he heard on the 911 recording saying "Bitch." The recording also captures Goodwin repeatedly screaming, "Get away from here!"

The responding police officer, Officer Robert Paul, arrived on the scene and observed Thomas quickly get into a car and drive away at a high rate of speed. Goodwin and Gayden were yelling, "That's him." Officer Paul attempted to chase Thomas's car but his lead was too great. When Officer Paul returned to the scene, Goodwin and Gayden were crying and said they were afraid that Thomas would come back again. They also were angry that he kept getting away. Gayden noticed a rag stuffed in the tailpipe of Goodwin's car and showed it to the police officer. The gas tank was also open. Thomas previously had threatened to put sugar in the tank.

At approximately 4:00 a.m. on November 24, 2010, Gayden looked out the window and noticed that her mother's porch light was off, while it had been on

4

when her mother left the house early in the evening to spend the night at a friend's house.  Gayden heard footsteps and then a car speed away.  She went outside and saw that Goodwin's decorations and plants on the front porch had been cut up and everything had been torn down.  She noticed a note on the door with blood on it.  When the sun came up she went outside to inspect the damage and saw Thomas on the sidewalk in front of the house.  He said, "Tell your mom there's no love over here.  I'm going to get her.  I'm going to get her."  He got in his car and drove off as she called 911.  Gayden saw that the light bulb on the porch light had been unscrewed and there was blood on it.  There was also blood on the porch and the sidewalk.  The bloody note said, "Bitch, I am going to kill you."  Goodwin recognized the handwriting as Thomas's.

Later that same day, Gayden and Goodwin found a second note inside their mailbox, also with blood on it.  It read, "I'm going to kill you on my mother and brother, you no dick sucking bitch."  Goodwin testified that Thomas used the expression "on my mother and brother," referring to his deceased mother and brother, when he was upset and meant to do what he said he was going to do.  She recognized the handwriting on the second note as Thomas's.  Goodwin was afraid that he would shoot or stab her and kill her.  She knew he had owned a gun in the past.  She again called 911.[2]

That night Thomas again appeared outside Goodwin's front door.  He said he was going to blast Goodwin, and she feared he had a gun.  She called 911 again.

On November 26, 2010, Goodwin called 911 seven times after Thomas came to her house repeatedly.  On November 29, 2010, Thomas came to

---

[2]     The parties stipulated at trial that the blood on both notes was Thomas's.  A handwriting expert testified that there were indications to suggest that it was Thomas's handwriting on the notes, but he could not render a more conclusive opinion.

Goodwin's house again and spoke to her through the locked door. He told her he had been watching her leave every day and had seen someone come to her house. He said, "I'm going to get you, bitch. I'm going to kill you, bitch." At 2:33 a.m. the following night, November 30, 2010, her alarm sensor went off. Goodwin saw Thomas at her front window, looking in. She called 911.

One of Goodwin's neighbors testified that at 2:50 a.m. one night in late November 2010, she saw Thomas peeking in the front window of Goodwin's house and then going around and peeking in the side window. Gayden's cousin, Sherita Kamil Travis, testified that on five to seven occasions in October and November 2010, she visited Goodwin's home and saw Thomas aggressively pacing back and forth in front of Goodwin's house, sitting in a car, or running into Goodwin's backyard and jumping over a fence. Goodwin became very scared and started crying on each occasion when Thomas appeared.

Goodwin did not see Thomas again until Christmas Eve. She ran into him at the home of Thomas's sister, when Goodwin stopped by to see a newborn baby. She was startled to see Thomas in the house, but she did not leave. She was a little bit fearful but did not think he would do anything to her with his family there. When she was leaving, he said, "You're not going to tell me bye?" She kept walking and said, "Don't get up. Stay where you are. Leave me alone." He followed her out to her car, saying he wanted to talk to her. They talked for a few minutes, and she told him he had to stop what he was doing and leave her alone. She denied that she sat in the car with him. Even though she felt fearful while talking to him, she was "not really getting results from the police," and thought that if she talked to him, she could convince him to leave her alone. Thomas told her he at least wanted to be friends, and that he would not hurt her. He said he was just upset that she had told him they were done. Goodwin left in her car.

6

B. *Defense Evidence*

Thomas did not testify in his defense.

Thomas's sister, Vonnie, testified that the day before Thanksgiving 2010, Goodwin came to her house. Thomas was there. After Goodwin spoke with Vonnie, she went into the living room, took Thomas's hand, and they went outside and talked. Goodwin was there for two to three hours, and she and Thomas did not fight. On Christmas Eve 2010, Goodwin came by Vonnie's house to wish her a merry Christmas. Thomas was there and Goodwin talked with him. She stayed for 30 to 40 minutes and she looked happy, not mad.

Vonnie identified Thomas's handwriting on the note that began, "I seen you and your friend." However, she denied that the two bloody notes were written in Thomas's handwriting.

Thomas's niece, Shaquita, testified that she saw Goodwin twice between October and December 2010. In early November, Shaquita came home and found Goodwin and Thomas outside the house in Goodwin's car. Goodwin held Shaquita's new baby and did not appear to be afraid of Thomas. Shaquita went into the house, but Goodwin remained there talking to Thomas for two to three hours. The two did not appear to be arguing. On Christmas Eve, Goodwin again came to Shaquita's house knowing that Thomas was inside. Goodwin led him outside and the two sat in Goodwin's car and talked for two to three hours.

On cross-examination, Goodwin acknowledged Thomas had not physically abused her during their 12-year relationship. She admitted that she drove Thomas to the hearing on the temporary restraining order, explaining that Thomas had claimed he would not come otherwise, and she believed she needed him to be there

7

for the court to grant the order. Goodwin admitted she had been convicted of welfare fraud approximately 20 years before.

C. *Rebuttal Evidence*

Vonnie previously had been convicted of the felony offense of possession of a controlled substance while armed. She was convicted in a different case of transporting or selling PCP, also a felony.

*Verdicts and Sentencing*

The jury returned guilty verdicts on count 1 and counts 3-5, but found Thomas not guilty of count 2. A mistrial was declared as to count 6 after the jury deadlocked on the charge. Thomas waived a jury trial on the prior convictions and admitted them, and the court found them true.

The court denied Thomas's motion for a new trial on grounds of ineffective assistance of counsel. After granting Thomas's section 1385 motion, the court struck two of his more remote prior strikes and sentenced him to 25 years to life in prison as the base term in count 1, plus five years each for the two prior serious felony convictions. The concurrent sentences on counts 3 through 5 were stayed pursuant to section 654.

Thomas timely appealed.

## DISCUSSION

I. *Sufficiency of the Evidence*

Thomas contends that insufficient evidence was presented at trial to support his conviction for stalking. "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to

8

the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "We resolve all conflicts in the evidence and questions of credibility in favor of the verdict, and indulge every reasonable inference the jury could draw from the evidence." (*People v. Mendez* (2010) 188 Cal.App.4th 47, 56.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see *People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Section 646.9, subdivision (a) provides in pertinent part that "[a]ny person who . . . willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking." Subdivision (b) of section 646.9 provides for a harsher penalty for stalking "when there is a temporary restraining order, injunction, or any other court order in effect prohibiting the behavior described in subdivision (a) against the same party."

The statute defines "harasses" to mean "engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) "Course of conduct" means "two or more acts occurring over a period of time, however short, evidencing a continuity of purpose." (*Id.*, subd. (f).) Further, "'credible threat' means a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or

9

electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family.  It is not necessary to prove that the defendant had the intent to actually carry out the threat." (*Id.*, subd. (g).)

A. *"No Legitimate Purpose"*

Thomas first contends there was insufficient evidence that his repeated appearances at Goodwin's home "serve[d] no legitimate purpose" such that his conduct fell within the definition of harassing behavior.  (§ 646.9, subd. (e).)  Instead, he contends that the evidence at trial showed that he was "calling on her to revive his relationship with her" and was motivated by a "normal and natural intent and purpose of any boyfriend – that of trying to get back with his girlfriend."

In determining whether a defendant's purpose in contacting the stalking victim could be considered "legitimate," we consider the issue from "the view of the victim or a reasonable person," not the defendant.  (*People v. Tran* (1996) 47 Cal.App.4th 253, 260 (*Tran*).)  In *Tran*, the defendant was convicted of stalking the victim, a woman he knew from a club where they were both regular customers.  He wanted to have a romantic relationship and wanted her to leave her husband.  She repeatedly told him she did not want to see him, and he began to threaten to hurt her and her husband and to damage her car.  On one occasion, he smashed the windows of her car, and after another occasion when she saw him sitting in his car outside her apartment, her roommate's car window was discovered broken.  (*Id.* at pp. 257-258.)  One evening, the defendant brandished a hammer trying to prevent the victim from leaving the parking lot of the club.  (*Id.* at p. 257.)  In the last

10

encounter, the defendant appeared outside the victim's home wielding a long knife and began chasing the victim's husband, who was holding the couple's baby at the time. (*Ibid.*)

The defendant argued that the element of the stalking statute requiring that "the objectionable conduct 'serve[] no legitimate purpose,' is unconstitutionally vague and gives the violator no sufficiently definite basis for ascertaining what purposes are 'legitimate.'" (*Tran, supra*, 47 Cal.App.4th at p. 259.) He contended that the wording "allows the jurors to impose their own moral judgment on his actions, which he may have believed had a legitimate purpose, i.e., to convince [the victim] to leave her husband and pursue a romantic relationship with him." (*Id.* at p. 260.) The court rejected the argument that the defendant's desire to have a romantic relationship with the victim constituted a "legitimate purpose" such that his behavior fell outside the stalking provision. The court concluded that an ordinary person understands the conduct prohibited by section 646.9, namely following or harassing a person and making a credible threat with intent to place the person in reasonable fear of personal or family safety, and "[a]ny ulterior desire by defendant cannot excuse his commission of the prohibited acts." (*Id.* at p. 260.) The court found that the "[d]efendant cannot genuinely question that his acts of threatening [the victim] with a knife or hammer and chasing her husband and baby while wielding a long knife are prohibited, even if he somehow hopes the acts will persuade [the victim] to leave her husband." (*Ibid.*)

Similarly, Thomas's desire to have Goodwin take him back as her boyfriend does not constitute a "legitimate purpose" that renders the stalking statute inapplicable. An obsessive attraction to the victim is a trait shared by many defendants convicted under the stalking statute. The statute would be eviscerated

11

were such one-sided, unwanted romantic interest deemed a legitimate purpose for conduct that otherwise would be considered harassing.

Moreover, Thomas's repeated visits to Goodwin's house beginning in early October 2010 were inherently unlawful because they violated restraining orders that were in place. "Legitimate" is "[t]hat which is lawful, legal, recognized by law, or according to law." (Black's Law Dict. (5th ed. 1979) p. 811.) Because Thomas's contacts with Goodwin were unlawful due to the restraining order, they cannot have served a legitimate purpose.

Finally, Thomas's argument that he was only trying to get back with his girlfriend unfairly minimizes his disturbing criminal behavior that included leaving Goodwin bloody notes in which he threatened to kill her, making repeated verbal threats to "blast" her, destroying her property, and entering her backyard by climbing over neighbors' fences. No reasonable person could find a legitimate purpose for such conduct. Therefore, sufficient evidence supported the jury's conclusion that Thomas's conduct had no legitimate purpose.

B. *"Credible Threat"*

Thomas also contends that there was insufficient evidence that Thomas made a "credible threat" with the intent to place Goodwin in reasonable fear for her safety or the safety of her immediate family. (§ 646.9, subd. (a).) Thomas contends both that Goodwin did not actually fear that Thomas would hurt her or a family member, and that any such fear was not reasonable.

Thomas relies on testimony from his niece Shaquita that on approximately November 24, 2010, Goodwin and Thomas sat in Goodwin's car talking for two to three hours, and on Christmas Eve, Goodwin talked with Thomas for another two to three hours outside Shaquita's home. He contends that the fact that Goodwin sat

12

in the car with him for this length of time demonstrates that she was not afraid of him. He also relies on Goodwin's testimony that when she spoke with Thomas on December 24, 2010, he told her he wanted to at be friends and would not hurt her. Finally, he relies on evidence that Thomas never physically abused Goodwin while they were together. He contends that given this evidence, the jury could not reasonably find that Goodwin had reason to fear for her safety or the safety of her immediate family. We disagree.

First, Thomas ignores the contradictory testimony from Goodwin that she never sat in a car with him. "The testimony of one witness, if believed, may be sufficient to prove any fact." (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508; Evid. Code, § 411.) Because we resolve all conflicts in the evidence and questions of credibility in favor of the verdict (*People v. Mendez, supra*, 188 Cal.App.4th at p. 56), we must credit Goodwin's account that she did not sit in the car with Thomas.

Moreover, Thomas ignores Goodwin's explicit testimony that she was afraid that Thomas was going to kill her or hurt her family members. She testified that even when she spoke to Thomas on Christmas Eve at Thomas's sister's house, she remained fearful, but she did not believe he would do anything with his family there. Further, Gayden gave corroborating testimony regarding the fear that Thomas's conduct induced. Gayden's cousin, Travis, testified that she saw Goodwin looking scared and crying on the five to seven occasions that Travis was visiting them while Thomas was lurking near her home. In addition, Officer Paul testified that Goodwin was scared and crying on one instance when Thomas got away on November 19, 2010, after threatening her.

Further, Thomas ignores the evidence of the measures Goodwin took to protect herself, including obtaining restraining orders, installing a security system,

13

calling 911 repeatedly, and constructing a booby trap to alert her if Thomas jumped the fence into her backyard, all of which further support the conclusion that she was afraid for her and her family's safety. Sufficient evidence was thus presented at trial that Goodwin actually feared for her safety.

Nor can the reasonableness of Goodwin's fear seriously be questioned. Despite Goodwin's efforts to deter him, Thomas's conduct escalated in severity in October and November 2010 to the point that he left her death threats with his blood on them. We cannot agree with Thomas that his repeated threats to blast her, get her, and kill her reasonably should have been considered "empty remark[s]," particularly when Goodwin knew that Thomas had owned a gun in the past and had physically abused his former wife. Thomas's statement to Goodwin on Christmas Eve 2010 that he would not hurt her does not negate the reasonableness of Goodwin's fears to the contrary. "[I]t is a sad truth, and one commonly reported, that persons . . . in the grips of an obsession, have killed or harmed the object of that obsession, even while maintaining that they have no desire to cause harm." (*People v. Falck* (1997) 52 Cal.App.4th 287, 298 (*Falck*).) Sufficient evidence was presented that Goodwin reasonably feared that Thomas would hurt her.

Finally, sufficient evidence was provided at trial from which to infer that Thomas intended to make Goodwin fear for her safety.[3] Thomas's intent to cause fear in Goodwin may be shown from the surrounding facts and circumstances. (*Falck, supra*, 52 Cal.App.4th at p. 299; *People v. Thomas* (2011) 52 Cal.4th 336, 355 ["Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially."].) Such intent can easily be inferred from

---

[3] It need not be shown that Thomas actually intended to carry out the threat. (*Falck, supra,* 52 Cal.App.4th at p. 295; *People v. Carron* (1995) 37 Cal.App.4th 1230, 1240.)

14

the death threats Thomas made towards Goodwin, particularly the bloody notes promising that he would kill her, including a promise made "on my mother and brother." From such a note it is difficult to devise any intent other than to make Goodwin afraid that he was going to kill her. Even without such explicit threats to "blast" her or kill her, the persistent visits to her home after she obtained a restraining order, including instances where he destroyed her property, reasonably could be considered evidence of an intent to place Goodwin in fear. (*People v. Uecker* (2009) 172 Cal.App.4th 583, 597 ["[I]t can be inferred defendant intended to place [the victim] in reasonable fear for her safety from his persistent phone contacts with her despite her attempts to end them"]; *Falck, supra,* 52 Cal.App.4th at p. 299 ["it can be inferred that appellant intended to cause fear in the victim from the fact that he insisted on maintaining contact with her although she clearly was attempting to avoid him"].) Sufficient evidence was presented at trial that Thomas acted with the intention of inducing fear in Goodwin.

II.     *Judicial Misconduct*

Thomas was charged with five counts of making criminal threats, and ultimately was convicted of three of the counts. During defense counsel's opening statement, he twice referred to the criminal threat counts as counts for "terrorist" threats. At the conclusion of the statement, the prosecutor asked the court, "[C]ould we correct the record? It's not terrorist threats. It's criminal threats." The court immediately instructed the jury as follows, "There's been a change in the name of the crime, ladies and gentlemen. They are synonymous. They are interchangeable. But the technical term now is criminal threats."

Thomas contends that the trial court confused the jury, because the term "terrorist" has taken on such a hateful connotation in this country given the

terrorist attacks on innocent people in recent times. He contends that the trial court's error in equating "terrorist threats" and "criminal threats" constituted judicial misconduct that irreparably prejudiced him in the eyes of the jury. We reject his argument.

First, we note that Thomas forfeited the argument because his counsel did not object to the court's equation of terrorist and criminal threats. (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 ["As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial."]; *People v. Abel* (2012) 53 Cal.4th 891, 914.) Even assuming Thomas's claim is properly before us, it fails on the merits.

The current heading of title 11.5 of the Penal Code, which contains section 422, is labeled "Criminal Threats." (§ 422.) However, before legislative amendments to section 422 in 2000, that heading was labeled "Terrorist Threats" not "Criminal Threats." (Stats. 2000, ch. 1001, § 4; Stats. 1988, ch. 1256, § 4, p. 4184; *People v. Toledo* (2001) 26 Cal.4th 221, 224, fn. 1.) The text of the statute was the same before and after the amendments. (*People v. Toledo, supra,* 26 Cal.4th at p. 224, fn. 1.) Thus, until 2000, a violation of section 422 was labeled a "terrorist threat," even though the body of the statute did not reference "terrorists" or "terrorism." (*People v. Moore* (2004) 118 Cal.App.4th 74, 78-79.) Even after the 2000 amendment, courts sometimes still refer to violations of section 422 as "terrorist threats." (E.g., *In re Q.N.* (2012) 211 Cal.App.4th 896, 899; *People v. Gerold* (2009) 174 Cal.App.4th 781, 784; *People v. Gaut* (2002) 95 Cal.App.4th 1425, 1430.) Therefore, the trial court accurately told the jury that the terms "criminal threats" and "terrorist threats" are used interchangeably.

We do not credit Thomas's argument that the court's clarification tainted Thomas in the minds of the jury and caused them to consider him in a worse light

16

given the terrorist attacks on Americans early in this century.  There was no suggestion during the trial that Thomas was involved in political or nationalistic terrorism, and the court correctly instructed the jury on the elements of section 422, which likewise do not reference terrorism.  In sum, the court committed no judicial misconduct, and Thomas suffered no prejudice.

III.    *Ineffective Assistance of Counsel*

Thomas contends that his trial counsel was ineffective in two ways:  (1) in failing to object to the trial court's statement to the jury that the phrases "terrorist threats" and "criminal threats" are synonymous; and (2) in failing to convince the trial court to permit him to cross-examine Goodwin regarding Thomas's allegation that she had stolen money from him while he was in jail.

To prove ineffective assistance of counsel, Thomas must show that (1) his counsel's representation fell below an objective standard of reasonableness, and (2) the deficiency resulted in demonstrable prejudice.  (*People v. Bolin, supra,* 18 Cal.4th at p. 333.)  "A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.  [Citations.]"  (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

"Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts."  (*People v. Hart* (1999) 20 Cal.4th 546, 623.)  On a direct appeal, we may reverse a conviction on the ground of ineffective assistance of counsel "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or

17

omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581; see *People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

We conclude that Thomas has failed to meet the standard for proving ineffective assistance of counsel on a direct appeal. With respect to the trial court's admonition to the jury that the phrases "terrorist threats" and "criminal threats" were interchangeable, we have concluded above that the trial court accurately commented on the state of the law. Therefore, defense counsel did not fall below the standard of professional competence to which counsel is held in failing to object to the trial court's instruction.

With respect to Thomas's argument that defense counsel should have more vigorously sought leave to cross-examine Goodwin on the issue of whether she stole money from him, the record demonstrates a "rational tactical purpose" for his counsel's failure to press the issue despite its potential relevance. (*People v. Fosselman, supra*, 33 Cal.3d at p. 581.)

The record reveals the following:

Before defense counsel began his cross-examination of Goodwin, the prosecutor stated, "I want to make sure that [counsel] is not going to cross-examine about the allegations of the victim's stealing money from him." Defense counsel stated he did not see any reason why he could not. The prosecutor explained, "The defendant was in custody from another case from . . . at least February until July. In February he signed a document. . . . They were still friendly, right, February 2010. . . . She visited him in jail, and he signed a document allowing her to access his accounts to pay his bills because he was in custody. And we sat down – the former attorney believed that she made this all up because she stole his money. We sat down with the former attorney with all of the documentation and proved that every single penny that she took out for him was paying his bills, and that

18

attorney was satisfied. . . . That attorney would never have brought it up. So any accusation of the victim stealing money from the defendant is a can of worms." The prosecutor stated he had the records, and was happy to sit down with defense counsel. The court asked if any charges were brought against Goodwin, and the prosecutor said no.

Defense counsel argued that "the defendant believes she made many of the allegations in retaliation for his complaints to both the Social Security Administration and the County's in-home supportive services unit, because she was also a caretaker receiving moneys from the County to take care of him, take care of his house, in-home supportive services." He argued that although no charges were brought against her based on the alleged theft, a formal complaint was made. The court stated:

"THE COURT: You said . . . there was a formal complaint against your client. Would [Goodwin] be able to bring those up?

"[DEFENSE COUNSEL]: No, Your Honor.

"THE COURT: Then you can't either.

"[DEFENSE COUNSEL]: All right.

"THE COURT: Same rules for both sides."

As demonstrated by the foregoing, defense counsel presented an argument justifying cross-examination of Goodwin regarding the theft allegations, and the prosecutor indicated that the documentary records showed that the allegations were unfounded and that Thomas's previous counsel had conceded as much. The trial court ruled against the admission of the testimony[4] and defense counsel reasonably

---

[4] The trial court appears to have mistakenly inferred that a complaint was brought against Thomas, when defense counsel indicated that a complaint was brought against Goodwin based on the alleged theft. Thomas does not argue that the trial court abused its discretion with respect to this ruling, and in any event, based on the prosecutor's

did not further object to the decision given the prosecutor's explanation and offer of proof.  In sum, Thomas has not demonstrated that his trial counsel's conduct fell below the standard for competent representation.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.



We concur:




EPSTEIN, P. J.




SUZUKAWA, J.

---

argument and offer of proof, we conclude that the decision to preclude cross-examination on this issue was not an abuse of discretion.