Filed 5/5/16   P. v. Murillo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JAIME MURILLO,<br><br>　　　Defendant and Appellant. | H041898<br>(Monterey County<br>Super. Ct. No. SS131148A)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 11, 2016, be modified in the following particulars:

1.　　On page 3, in the first full paragraph, add a comma and the phrase "who was about five feet eleven inches tall" after the word "Milligan," so the sentence reads: According to Jane Doe, Milligan, who was about five feet eleven inches tall, stood up and asked defendant if there was a problem.

2.　　On page 3, in the fourth full paragraph, add the phrase "with the guitar 'slung' on his shoulder" at the end of the second sentence, so the sentence reads: Milligan walked towards defendant with the guitar "slung" on his shoulder.

3.　　On page 4, in the first paragraph, add the phrase "indicating he was Hispanic and about five feet five inches tall" at the end of the second sentence, so the

sentence reads: Jane Doe described the shooter to the operator, indicating he was Hispanic and about five feet five inches tall.

4.  On page 9, in the third full paragraph, add a comma and the phrase "with the guitar 'slung' on his shoulder" in the third sentence, following the phrase "walked towards defendant," so the sentence reads: Second, Milligan walked towards defendant, with the guitar "slung" on his shoulder, when defendant was approaching.

5.  On page 10, line one, add the phrase "or carry the guitar in a menacing manner" after the word "weapon," so the sentence starting on the bottom of page 9 reads: For instance, Milligan did not display a weapon or carry the guitar in a menacing manner, and there was no evidence he approached defendant aggressively.

There is no change in the judgment.

The petition for rehearing is denied.

_____
BAMATTRE-MANOUKIAN, J.

_____
ELIA, ACTING P.J.

_____
MIHARA, J.

2

Filed 4/11/16  P. v. Murillo CA6 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041898 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS131148A) |
| v. | |
| JAIME MURILLO, | |
| Defendant and Appellant. | |

## I.   INTRODUCTION

A jury convicted defendant Jaime Murillo of first degree murder (Pen. Code, § 187, subd. (a)),[1] found true an allegation that defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (d)), and found true an allegation that defendant committed the murder for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subds. (b)(1) & (b)(5)).  In a separate case, defendant pleaded no contest to carrying a loaded firearm in a public place (§ 25850, subd. (a)) and admitted that he committed that crime for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(a)).

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The trial court sentenced defendant to a prison term of 25 years to life for the murder, a consecutive term of 25 years to life for the associated firearm allegation, and a consecutive life term with a minimum of 15 years for the associated gang allegation. In the second case, the trial court sentenced defendant to a term of three years for carrying a loaded firearm and a consecutive term of four years for the associated gang allegation.

On appeal, defendant contends the trial court erred by failing to instruct the jury on voluntary manslaughter as a lesser included offense of murder, because there was substantial evidence to support a finding of imperfect self-defense. Defendant also contends the instruction on provocation, CALCRIM No. 522, was incomplete and misleading. Defendant further contends that his trial counsel was ineffective for failing to object to prosecutorial misconduct during closing argument. Finally, defendant contends the cumulative effect of the errors violated his right to a fair trial. For reasons that we will explain, we will affirm the judgment.

## II.    BACKGROUND

### A.    *The Shooting of Olajuwon Milligan*

On the afternoon of March 14, 2013, John Doe No. 1 and John Doe No. 2 went to defendant's house, where they made a plan to go smoke marijuana. Defendant and John Doe No. 1 were both members of a Sureño gang subset called Cortez. Defendant took his .357 revolver with him before leaving. Defendant put the gun in his waist area, saying he wanted it "just in case there's a Northerner." Defendant was wearing a Dallas Cowboys beanie, which had a blue star on it.

Defendant, John Doe No. 1, and John Doe No. 2 walked to an area behind Alisal High School where Sureño gang members often hung out. Olajuwon Milligan and his girlfriend, Jane Doe, were in the area. Milligan, a Norteño gang member, was wearing a red shirt and playing a guitar. As defendant's group passed by, either defendant or Milligan spoke first. According to John Doe No. 1, defendant asked Milligan, "What's

2

up?" According to Jane Doe, Milligan asked defendant's group what they were doing there, saying, "What's cracking?" Defendant replied, "What's bracking?"

According to Jane Doe, Milligan stood up and asked defendant if there was a problem. Defendant replied, "No. We can just go around the corner," suggesting that Milligan follow him. Milligan took off his sunglasses, revealing a tattoo of four dots underneath his right eye. Milligan suggested that if there was a problem, they could take care of it "right here."

According to John Doe No. 2, defendant exchanged "gang type" words with Milligan. Milligan called defendant a "scrap," which is a derogatory word that Norteños use towards Sureños. The veins started popping out on both defendant and Milligan's necks as they continued to argue. Defendant told Milligan, "Well, if you're going to do something, do it."

After the exchange of words, Milligan and Jane Doe walked away, towards Jane Doe's house. Defendant walked in the same direction after telling John Doe No. 1 and John Doe No. 2, "I'm going to show him how a real C boy does it." By "C boy," defendant was referring to a member of the Cortez gang.

As defendant approached Milligan and Jane Doe, he started yelling, "Sup what?" Milligan walked towards defendant. Jane Doe could see defendant doing something around his belt area. Defendant asked Milligan if Jane Doe was his sister. Milligan said no. Defendant and Milligan did something resembling a handshake or fist bump.

Defendant then pulled a gun out from the side of his pants and fired a shot. Milligan began to run away as defendant fired a second shot, bumping defendant's shoulder as he ran. Milligan fell down after defendant fired a third shot. Defendant left as Jane Doe went over to help Milligan, who was bleeding. Milligan subsequently died; an autopsy revealed four gunshot wounds to his body. The gunshots were in Milligan's chest, neck, back, and back of the head.

Jane Doe called 9-1-1 from the scene to report the shooting. Jane Doe described the shooter to the operator. The police arrived at the scene and took Jane Doe to view a possible suspect, who she did not identify. The police subsequently showed Jane Doe photographs. She initially picked out someone who looked like one of defendant's companions. A few days later, she looked at more photographs and tentatively identified defendant. A few weeks later, Jane Doe viewed additional photographs, including a more recent photograph of defendant, and she positively identified defendant.

On the night of the shooting, John Doe No. 1 and defendant watched the news and saw a report about the shooting. Defendant was acting "happy." On other occasions, he laughed about what he had done or made comments such as, "Oh, remember when I dropped that fool? That's wassup."

### B.    Gang Evidence

John Doe No. 1 testified that he became a Sureño gang member at age 13. He learned that Sureño gang members commit crimes: they steal cars, do shootings, and rob peoples. Sureño gang members associate with the color blue and the numbers 3, 13, and 30. Although there are various subsets, the common enemy of Sureño gang members is "Northerners" (Norteños), who associate with the color red and the number 14. Sureño gang members get respected by "putting in work," such as by "looking for Nortenos," getting in fights, or stealing. Shooting a Norteño would get a Sureño gang member a lot of respect, as would killing a Norteño in Sureño territory.

Defendant had previously admitted to police that he associates with Sureños, and gang indicia had been found at his residence. After the Milligan shooting, defendant got a broken star tattoo, indicating he had killed a Northerner. Defendant also had tattoos reading "CS," for "Cortez Street," and "NK," for "Norteno killer."

The prosecution's gang expert was Salinas Police Officer Michael Cupak. He testified that Sureño gangs associate with the color blue and the number 13, including variations of that number (e.g., Roman numerals). The primary activities of the Sureño

4

gang include "eliminating" Norteños and making money.  The primary crimes of Sureño gangs are murder, drug sales, possession of illegal weapons, stolen weapons, possession of stolen vehicles, robbery, and burglaries.

Officer Cupak testified about several previous crimes committed by known Sureño gang members:  a murder committed by Angel Ocampo on June 4, 2008; a murder committed by Valentin Rivas and Benjamin Carillo on January 12, 2009; a murder committed by Antonio Gayoso and Carlos Espinosa on August 6, 2009; a murder committed by Santiago Ortiz and Ricardo Martinez on July 28, 2010; an auto theft and evasion committed by Rogelio Juarez, Jr. on September 16, 2011; possession of a firearm committed by Christopher Ruiz on March 19, 2012; possession of a loaded firearm committed by Caesar Gomar on August 20, 2012; and possession of a firearm by Luis San Pablo Cardiel on October 24, 2012.

On April 2, 2013, a few weeks after the Milligan shooting, defendant was contacted by police.  Defendant was in the back seat of a vehicle.  Two other individuals were in the front of the vehicle.  In the back of the vehicle, police found a firearm and number of documents containing handwritten rap lyrics.  Some of the lyrics referred to "unload[ing] the heat," being armed with a firearm, shooting someone, and committing gang crimes.  The lyrics also contained language disrespectful to Norteños.  Defendant's cell phone was seized; it contained a text indicating that defendant wanted to be a member of the Mexican Mafia, "the supreme Sureno gang."

Defendant was found with gang indicia years earlier as well.  During a contact on August 12, 2007, defendant was in possession of handwritten rap lyrics that referenced killing a rival gang member, unloading a firearm on a Norteño, and shooting at a person's head.

Officer Cupak testified that the area where Milligan and Jane Doe had been hanging out was an alley containing Sureño graffiti.  If someone was wearing red in that area, Sureño gang members would consider it an act of disrespect, and they would want

5

to attack or kill the person. Killing the person would help the perpetrator move up in the ranks of the Sureño gang.

Officer Cupak further testified that sometimes, a Sureño gang member will lure a victim in by greeting him and shaking his hand. He acknowledged that a Norteño in the alley area would likely know that his presence there could result in violence.

### C.      Defense Case

The defense case focused on the possibility that defendant was misidentified. An officer testified that Jane Doe listened to an audio recording of defendant's voice after the shooting, but she did not recognize his voice as the voice of the shooter.

The defense also sought to establish an alibi. Defendant's mother testified that on the day of the Milligan shooting, defendant was at home. Defendant then went to his aunt's residence. Defendant's sister testified that she got out of school at 1:10 p.m. that day. She went home and then to her aunt's house, where she and defendant watched videos together "for a pretty long time."

Defendant did not testify. Defendant's trial counsel argued to the jury that Jane Doe's identification of defendant was not credible and that defendant should be found not guilty. Alternatively, he asserted that if the jury found defendant was the person who shot Milligan, the jury should find provocation and convict defendant of only second degree murder. He argued that provocation was present due to Milligan's presence in the Sureño area while wearing red, Milligan's initiation of communication, and Milligan's act of displaying his gang tattoos. Defendant's trial counsel further argued that there was no evidence of a plan to kill Milligan.

### D.      Charges, Verdicts, and Sentence

Prior to trial, the prosecution moved to consolidate the murder case with a case in which defendant was charged with possessing a gun on April 2, 2013. Defendant subsequently pleaded no contest to carrying a loaded firearm in a public place (§ 25850, subd. (a)). Defendant also admitted that the firearm was stolen (§ 25850, subd. (c)(2))

6

and admitted that he committed that crime for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(a)).

Defendant proceeded to trial on the murder charge. The jury convicted him of first degree murder (§ 187, subd. (a)), found true an allegation that defendant personally and intentionally discharged a firearm (§ 12022.53, subd. (d)), and found true an allegation that defendant committed the murder for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subds. (b)(1) & (b)(5)).

At the sentencing hearing, the trial court sentenced defendant to a prison term of 25 years to life for the murder, a consecutive term of 25 years to life for the associated firearm allegation, and a consecutive life term with a minimum of 15 years for the associated gang allegation. The trial court sentenced defendant to a term of three years for carrying a loaded firearm and a consecutive term of four years for the associated gang allegation.

### III. DISCUSSION

#### A. *Failure to Instruct on Voluntary Manslaughter*

Defendant contends the trial court erred by failing to instruct the jury on voluntary manslaughter. He contends a voluntary manslaughter instruction was warranted because there was substantial evidence to support a finding that defendant shot and killed Milligan in the actual but unreasonable belief that he was in imminent danger of death or great bodily injury—i.e., in imperfect self-defense. Defendant contends the error affected his right to have the prosecution prove his guilt beyond a reasonable doubt under the Sixth and Fourteenth Amendments to the United States Constitution.

#### 1. **Proceedings Below**

Below, defendant did not argue that the trial court should give a voluntary manslaughter instruction based on imperfect self-defense, but his trial counsel asked the trial court to give a voluntary manslaughter instruction because the evidence supported a

7

finding of "provocation by the victim" and a heated argument between defendant and Milligan. The prosecutor asked the trial court not to give voluntary manslaughter instructions, arguing that the evidence supporting such instructions was "weak at best" and providing legal authority for the proposition that gang-related challenges do not constitute sufficient provocation.

The trial court found that there was no evidence that would pass the "reasonable person standard" for provocation, noting that "the standard is not the reaction of a reasonable gang member" but rather an objective standard of "a reasonable person." The trial court also found that there was no evidence that defendant was "under the actual influence of strong passion that was induced by the provocation." Thus, the trial court declined to instruct on voluntary manslaughter.

### 2. Analysis

" ' " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citation.] . . .' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" ' " (*People v. Souza* (2012) 54 Cal.4th 90, 114 (*Souza*).)

" 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.' [Citations.]" (*Souza, supra,* 54 Cal.4th at p. 116.) "On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense. [Citation.]" (*Id.* at p. 113.)

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably believed

8

he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771 (*Christian S.*).)

"[T]he doctrine [of imperfect self-defense] is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . . Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" ' " (*Christian S., supra,* 7 Cal.4th at p. 783.)

Since defendant did not testify, his actual belief must be determined from the circumstantial evidence in the record. (See *People v. Falck* (1997) 52 Cal.App.4th 287, 299 [intent can be inferred from circumstantial evidence].)

Defendant contends an imperfect self-defense instruction was warranted based on the following facts. First, Milligan had engaged in threatening gang behavior by being present in a Sureño area while wearing red, by issuing a verbal challenge, and by flashing gang tattoos. Second, Milligan walked towards defendant when defendant was approaching. Third, Milligan and defendant had very recently discussed fighting.

We disagree that the above facts provided substantial evidence that defendant killed Milligan because he actually believed he was in imminent peril. (See *Christian S., supra,* 7 Cal.4th at p. 783.) First, Detective Cupak, the gang expert, testified that wearing red in a Sureño gang would be seen as an act of disrespect, such that a Sureño gang member might want to attack or kill the person. He did not testify that such behavior would be perceived as an imminent threat of death or great bodily injury to a Sureño gang member. Second, although Milligan walked towards defendant, nothing suggested defendant believed he was about to be attacked. For instance, Milligan did not display a

9

weapon, and there was no evidence he approached defendant aggressively. Third, although defendant and Milligan had discussed fighting, Milligan had declined defendant's challenge to go around the corner to fight, and he had walked away after defendant's challenge to "do something."

The following additional facts support our conclusion that there was no substantial evidence warranting a voluntary manslaughter instruction based on imperfect self-defense. After Milligan walked away from the confrontation with defendant, defendant specified he was going to go after Milligan, stating, "I'm going to show him how a real C boy does it," then followed Milligan. Defendant also issued a verbal challenge to Milligan before Milligan started walking to meet defendant. Also, before Milligan began walking back towards defendant, defendant started doing something around his belt area, from which he later pulled out the gun. When Milligan and defendant got close to one another, defendant asked Milligan if Jane Doe was his sister, and defendant and Milligan did something resembling a handshake or fist bump. And finally, defendant shot Milligan multiple times, including several shots fired as Milligan was running away. These facts showed that defendant was the aggressor and that he did not have an actual belief that Milligan was about to attack him.

On this record, after performing an independent review of the facts, we conclude that the trial court did not err in refusing to instruct the jury on voluntary manslaughter based on imperfect self-defense because there was no substantial evidence that defendant shot at Milligan in the actual belief that he was defending himself against imminent danger of death or great bodily injury. (See *Christian S., supra,* 7 Cal.4th at p. 783.)

**B.    CALCRIM No. 522**

Defendant contends the instruction on provocation, CALCRIM No. 522, was incomplete and misleading. Specifically, he contends the instruction failed to explain that provocation has a subjective standard, failed to explain that the prosecution has the burden of proving the absence of provocation, and left "the role of provocation and

10

weight" to the jury. (See *People v. Jones* (2014) 223 Cal.App.4th 995, 1000 (*Jones*) ["a subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked"]; *People v. Rios* (2000) 23 Cal.4th 450, 462 ["If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case . . . , the *People* must prove *beyond reasonable doubt* that these circumstances were *lacking* in order to establish the murder element of malice."].)

### 1.      Instructions Given

Pursuant to CALCRIM No. 520, the jury was instructed, "The defendant is charged in Count 1 with murder in violation of Penal Code Section 187." The instruction specified that the People were required to prove: "[O]ne, the defendant committed an act that caused the death of another person. And, two, when the defendant acted, he had a state of mind called malice aforethought." The instruction further provided: "If you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM number 521, which is the next instruction."

Pursuant to CALCRIM No. 521, the jury was instructed that defendant was guilty of first degree murder "if the People have proved that he acted willfully, deliberately and with premeditation." That instruction defined the terms willfully, deliberately, and premeditation, and it informed the jury that "[a] decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated." The instruction also stated, "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is murder in the second degree."

Pursuant to CALCRIM No. 522, the jury was instructed, "Provocation may reduce a murder from first degree to second degree. The weight and significance of the

11

provocation, if any, are for you to decide.  If you conclude that the defendant committed murder, but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

Pursuant to CALCRIM No. 200, the jury was told, "Pay careful attention to all of these instructions and consider them together."

### 2. Analysis

Defendant acknowledges that he did not object to CALCRIM No. 522 below, but he contends that he did not forfeit his challenge to the instruction because the instruction affected his substantial rights.  (See § 1259.)  Defendant alternatively contends his trial counsel was ineffective for failing to object.  We will assume that no objection was required to preserve this instructional challenge and proceed to the merits.  (See *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1331, fn. 2 (*Hernandez*) [addressing a similar challenge to CALCRIM No. 522 despite lack of an objection at trial].)

" 'When reviewing a supposedly ambiguous [i.e., potentially misleading] jury instruction, " 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' [Citation.]" (*People v. Ayala* (2000) 24 Cal.4th 243, 289 (*Ayala*).)  We " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.  [Citation.]" ' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)  " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)

The courts in *Hernandez* and *Jones* rejected arguments similar to the contentions defendant makes in this case.  As we shall explain, we agree with the reasoning of those cases.

12

In *Hernandez,* the defendant asserted that "CALCRIM No. 522 is incomplete and misleading because (1) it fails to specify that provocation can negate the premeditation and deliberation necessary for first degree murder; (2) it instructs the jury that it may decide the significance of the provocation; and (3) it fails to instruct the jury that provocation insufficient for manslaughter may be sufficient for second degree murder." (*Hernandez, supra,* 183 Cal.App.4th at p. 1331, fn. omitted.) In rejecting these arguments, the *Hernandez* court found it significant that, pursuant to CALCRIM No. 521, the jury had been instructed "that a rash, impulsive decision to kill is not deliberate and premeditated." (*Hernandez, supra,* at p. 1334.) The court also held that CALCRIM No. 522's reference to the "weight and significance" of the provocation informed the jury that it was to determine whether the defendant was "provoked enough to create a doubt as to whether the offense was deliberate, premeditated first degree murder rather than a rash, impulsive second degree murder." (*Hernandez, supra,* at pp. 1334-1335.)

In *Jones,* the defendant contended that the jury instructions on the doctrine of provocation (including CALCRIM No. 522) were misleading because they did not explicitly "inform the jury that the objective standard applies only for reduction of murder to voluntary manslaughter, and does not apply to reduce first to second degree murder." (*Jones, supra,* 223 Cal.App.4th at p. 999.) Citing *Hernandez,* the *Jones* court held that "CALCRIM Nos. 521 and 522, taken together, informed jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' [Citation.]" (*Jones, supra,* at p. 1001.)

In this case, we find no "reasonable likelihood" that, under the instructions given, the jury would believe that provocation was to be judged by a solely objective standard or that defendant had the burden of proof on that issue. (See *Ayala, supra,* 24 Cal.4th at p. 289.) CALCRIM No. 520 told the jury that defendant was guilty of second degree murder unless the People proved, beyond a reasonable doubt, the elements of first degree murder as stated in the next instruction, CALCRIM No. 521. CALCRIM No. 521 then

13

informed the jury that defendant was guilty of first degree murder if the People proved, beyond a reasonable doubt, that he acted willfully, deliberately and with premeditation. That instruction also informed the jury that "[a] decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated." And finally, CALCRIM No. 522 told the jury that if it found that defendant "committed murder, but *was provoked*," it should "consider the provocation in deciding whether the crime was first or second degree murder." (Emphasis added.)

By informing the jury that it was to consider whether defendant "was provoked" and by stating that "[a] decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated," the instructions adequately conveyed to the jury that a subjective standard applied to the question of provocation. (See *Jones, supra,* 223 Cal.App.4th at p. 1001.) By stating that the "weight and significance" of the provocation was for the jury to decide, when considered with the other instructions, CALCRIM No. 522 told the jury to determine whether the defendant was "provoked enough to create a doubt as to whether the offense was deliberate, premeditated first degree murder rather than a rash, impulsive second degree murder." (*Hernandez, supra,* 183 Cal.App.4th at pp. 1334-1335.) And because CALCRIM Nos. 520 and 521 repeatedly told the jury that the People had the burden of proving beyond a reasonable doubt the elements of first degree murder, there was no "reasonable likelihood" that the jury would have applied a different burden of proof to the provocation issue. (See *Ayala, supra,* 24 Cal.4th at p. 289.)

In sum, we conclude that the instruction on provocation, CALCRIM No. 522, was not incomplete or misleading.

## C.     *Ineffective Assistance of Counsel/Prosecutorial Misconduct*

Defendant contends that his trial counsel was ineffective for failing to object to prosecutorial misconduct during closing argument. He contends that the prosecutor misstated the facts, referred to facts not in evidence, and misstated the law of

14

provocation. Since defendant's trial counsel did not object to the claimed instances of prosecutorial misconduct, defendant asserts that his trial counsel was ineffective. (See *People v. Dykes* (2009) 46 Cal.4th 731, 757 [generally, "trial counsel's failure to object in a timely manner to asserted prosecutorial misconduct . . . results in the forfeiture of the claim on appeal"].)

### 1. Proceedings Below

During argument to the jury, the prosecutor argued that defendant had acted with premeditation and deliberation because the rap lyrics he carried showed that he had been planning to kill a Norteño "for years" and because he had brought his gun, "looking for an opportunity." The prosecutor argued that after deciding to kill Milligan, defendant yelled at Milligan as Milligan was walking away, "to get his attention," then walked up to Milligan and pretended "he's his friend." The prosecutor asserted that before doing the fist bump with Milligan, defendant said, "I hit up those guys up there. Everything is okay." The prosecutor argued that defendant wanted to get close to Milligan so he could shoot him at close range, asserting, "This is intentional, premeditated, deliberate murder."

The prosecutor then referenced the provocation instruction. He argued, "For provocation to reduce this crime to a second degree murder, basically it's got to be the kind of provocation that makes somebody not able to think. And they can't have already planned the thing. [¶] So it does not even apply in this case. There's no such evidence that there was such a traumatic, horrible event to [defendant] who had not planned to do anything. . . . The only way something like that would happen is if this gang member here walks down to his alley and he's not armed. He's got no loaded gun with him. He's got no plan to kill Nortenos. He walks into the alley and say the victim said something just horrible, horrible, horrendous to him and he lost his cool. And because he didn't plan it, didn't bring a weapon, he picks up the nearest thing, which is maybe a stone. Crushes the guy on the head. That might maybe be provocation. [¶] That's not what we

15

have here. We have a plan. We have a lifelong plan to kill the enemy, to bring a loaded gun to shoot [his] target. Get him around the corner, lure him to [defendant]."

During closing argument, the prosecutor referenced the defense argument that the jury could find provocation based on Milligan's presence in the Sureño area, saying, "Let's blame the victim for wearing red. That's not provocation. It's not a bullfight. Wearing a color that that man doesn't like isn't a license for him to kill you. Being in a place that that man doesn't want you to be in isn't a license for him to kill you. Talking back to that man isn't a license for him to kill you. That is not legal provocation."

Defendant's trial counsel did not object during the above portions of the prosecutor's argument.

### 2. Legal Standards

"The standards under which we evaluate prosecutorial misconduct may be summarized as follows. A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).)

To prevail on an ineffective assistance of counsel claim, the defendant must show that (1) "counsel's performance fell below a standard of reasonable competence" and (2) "prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).) To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's

16

unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* at p. 694.)

### 3.      Alleged Factual Misstatements

Defendant claims that the prosecutor committed misconduct by misstating certain facts concerning the interaction between defendant and Milligan just prior to the shooting.

"At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom. [Citation.]" However, it is misconduct for a prosecutor to argue facts not in evidence "because such statements 'tend[ ] to make the prosecutor his [or her] own witness—offering unsworn testimony not subject to cross-examination.' " (*People v. Hill* (1998) 17 Cal.4th 800, 828 (*Hill*).)

Defendant first contends the prosecutor misstated the facts when he argued that defendant yelled at Milligan "to get his attention," then walked up to Milligan and pretended "he's his friend." Defendant asserts that the prosecutor thereby improperly suggested that "Milligan returned based on a belief that Murillo was offering reconciliation or a friendly encounter."

Having reviewed the record, we find nothing improper in the prosecutor's statements. John Doe No. 1 testified that as defendant followed Murillo and Jane Doe, who were walking away, defendant called out, "Sup what," to get their attention. Jane Doe testified that she saw defendant and Milligan shake hands or do a fist bump. The gang expert, Officer Cupak, testified that a Sureño gang member may try to lure a victim in by greeting him and shaking his hand. From this evidence, it was a "reasonable inference[]" that defendant was pretending to reconcile or be friendly to Milligan just before the shooting. (See *Hill, supra,* 17 Cal.4th at p. 828.)

Defendant next contends the prosecutor misstated the facts by stating that before doing the fist bump with Milligan, defendant said, "I hit up those guys up there.

17

Everything is okay." Defendant points out that the prosecutor also suggested that defendant made such a statement, by asking the gang expert his opinion about a hypothetical situation in which one gang member called out that he "hit up some other guys back there." Defendant asserts that he "never made such assuring statements" to Milligan.

As the Attorney General concedes, the record does not contain any evidence that defendant made any statement to Milligan similar to, "I hit up those guys up there. Everything is okay." However, this was a misstatement of fact that does not support a finding of prejudice. As noted above, other evidence supported the inference that defendant was pretending to reconcile or be friendly to Milligan just before the shooting: defendant's attempt to get the attention of Murillo and Jane Doe as they walked away, the hand shake or fist bump, and the gang expert's testimony that a Sureño gang member may try to lure a victim in by greeting him and shaking his hand. Moreover, the jury was instructed that it was for the jury "alone to decide what happened based only on the evidence that has been presented . . . in this trial" (see CALCRIM No. 200) and that "[n]othing that the attorneys say is evidence" (see CALCRIM No. 222). Defendant has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694; see *People v. Williams* (1997) 16 Cal.4th 153, 222 [counsel's failure to object to prosecutor's "minor factual misstatement" did not constitute ineffective assistance].)

### 4. Alleged Misstatements of Law

Defendant contends the prosecutor committed misconduct in several respects when discussing the law of provocation.

"[I]it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831.)

18

First, defendant claims the prosecutor improperly suggested that provocation cannot exist if the defendant carried a weapon. In context, there is no "reasonable likelihood" that the jury understood the prosecutor to be making such an argument. (See *Morales, supra,* 25 Cal.4th at p. 44.) The prosecutor contrasted the hypothetical situation of a gang member who had "no loaded gun with him" and "no plan to kill Nortenos" with this case, in which defendant had "a lifelong plan to kill the enemy, to bring a loaded gun to shoot [his] target." As the Attorney General asserts, this argument was not improper because "evidence of planning is inconsistent with provocation." (See *People v. Wharton* (1991) 53 Cal.3d 522, 572 ["planning and deliberate action" is inconsistent with "having acted under the heat of passion" even after "provocatory conduct"].)

Second, defendant claims the prosecutor improperly told the jury that the trial court would provide an instruction about "legal provocation." However, the prosecutor did not use that phrase when discussing the trial court's instruction. The prosecutor told the jury that the trial court would be giving the jury "an instruction about provocation," which was correct, since the trial court instructed the jury pursuant to CALCRIM No. 522.

Third, defendant contends the prosecutor misstated the law of provocation by telling the jury that provocation had to "make[] somebody not able to think." Defendant argues that this overstated the legal standard, which is that provocation must "preclude[] the defendant from deliberating." (See *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295.) Even assuming that the prosecutor's description of provocation was an overstatement, defendant has not shown a reasonable likelihood that the jury misapplied the law because of the prosecutor's argument. The jury was instructed to "follow the law" as provided in the trial court's instructions, which fully set forth and explained the requirements of premeditation and deliberation as necessary for a first degree murder verdict. (See CALCRIM Nos. 200, 520, 521.) The jury was also instructed that if "the attorneys' comments on the law" conflicted with the trial court's instructions, the jury

19

was required to follow the instructions. We presume the jury followed these instructions and applied the proper standards when determining defendant's mental state. (See *People v. Najera* (2006) 138 Cal.App.4th 212, 224.)

Fourth, defendant contends that by speaking in terms of provocation's effect on "somebody" rather than defendant, the prosecutor erroneously implied that provocation is judged by an objective standard. We disagree. The prosecutor told the jury that provocation had to be "the kind of provocation that makes somebody not able to think." By using the word "makes," the prosecutor correctly informed the jury that the standard was subjective—i.e., that provocation had to *actually* cause a particular mental state. Nothing in the prosecutor's argument suggested that the jury was to apply an objective, reasonable person standard to the determination of whether defendant was provoked into killing Milligan.

Fifth, defendant contends that the prosecutor improperly told the jury that provocation must be caused by a "traumatic, horrible event." Defendant asserts that the prosecutor's argument suggested the jury was foreclosed from finding provocation based on "words alone." However, as the Attorney General points out, the prosecutor explicitly told the jury that words alone—such as when the victim says "something just horrible, horrible, horrendous"—can support a finding of provocation. Moreover, in context, the prosecutor's argument amounted to " 'fair comment on the evidence,' " since the evidence reasonably supported a finding that nothing Milligan said or did actually caused defendant to be provoked. (See *People v. Ward* (2005) 36 Cal.4th 186, 215.)

Finally, defendant contends the prosecutor wrongly suggested that provocation was a defense that would excuse defendant from responsibility, by calling it a "license to kill." We disagree. At no time did the prosecutor argue that defendant would escape conviction or punishment if the jury found that he was provoked. Moreover, even if the prosecutor's remarks carried such an implication, the jury was instructed to "follow the law" as provided in the trial court's instructions, which properly explained that

20

provocation could reduce a first degree murder to second degree murder. (See CALCRIM Nos. 200, 520, 521, 522.)

In sum, we conclude that defendant has not shown "a reasonable probability" that had his trial counsel objected to the prosecutor's alleged misstatements of law, "the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694.)

### D.  *Cumulative Impact of Errors*

Defendant contends the cumulative effect of the errors violated his right to a fair trial. (See *Hill, supra,* 17 Cal.4th at p. 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].) We have concluded that the trial court did not err by refusing to instruct the jury on voluntary manslaughter based on imperfect self-defense; that the instruction on provocation, CALCRIM No. 522, was not incomplete or misleading; and that defendant's trial counsel was not ineffective for failing to object to the asserted prosecutorial misconduct. Therefore, there are no errors to cumulate.

## IV.  DISPOSITION

The judgment is affirmed.

21

_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:



_____
ELIA, ACTING P.J.




_____
MIHARA, J.