Filed 4/28/21  P. v. Jackson CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAH-JAH JACKSON,<br><br>    Defendant and Appellant. | B302324<br><br>(Los Angeles County<br>Super. Ct. No. BA478929) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Renee F. Korn, Judge.  Affirmed.

A. William Bartz, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Colleen M. Tiedemann, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Jah-Jah Jackson of stalking Sydnee Goodman.  Goodman hosted internet shows for computer video gamers, and Jackson was a member of Goodman's online audience.  Ultimately, Jackson used the internet to find Goodman's private home address.  Jackson challenges his felony conviction on First Amendment and other grounds, contending he did not *expressly* threaten Goodman.  However, his emails, coupled with his conduct, are substantial evidence to support his conviction for stalking.  We affirm the judgment.  Statutory citations are to the Penal Code.

### STATEMENT OF FACTS

Goodman hosted two daily gamer news shows, attended events and conventions, and maintained a presence on social media, including on YouTube, Instagram, Snapchat, and, prominently, Twitch.  Jackson became aware of Goodman in January 2019 through Snapchat.  He referred to himself as Goodman's "supporter."  In February 2019, Jackson began paying a monthly fee to subscribe to Goodman's Twitch channel.  Jackson began interacting with Goodman "[e]very time she got online on Twitch" and commented on every picture Goodman posted.  Jackson sent messages to Goodman's chat room from January 2019 until May 27, 2019, when the chat room banned him for his harassing postings.

In May 2019, Jackson moved from the Washington, D.C. area to Ontario, California to enroll in the Universal Technical Institute.

In January 2019, Goodman became aware of Jackson, but only through Jackson's screen name "deusxmachina303."

Jackson never revealed his true name to others online.  Later Jackson used a second online name:  "cardinal_faust."

Goodman saw Jackson—that is, "deusxmachina303"—as "a very big fan" who was extremely engaged in Goodman's content.

Goodman interacted with fans on her own server on Discord.  Discord is an internet site that "is almost like a chat room, but you can have it individually."  In Goodman's chat room, Jackson was "very, very active . . . .  He would say 'good morning' and tag [Goodman] in it every morning."  Goodman would stream live on Twitch and her viewers could post comments and interact with her and other online fans.  Jackson would tag Goodman to make sure she saw his comments and posts.  Jackson also interacted with Goodman on other internet platforms.

Jackson's degree of attention made Goodman "a little uncomfortable."  She "mentally flag[ged]" Jackson and "knew that I had to really uphold boundaries there."  In response to Jackson's morning greetings, for instance, Goodman would write "good morning, everyone" rather than address Jackson individually.

Jackson's postings began to create problems.  On May 27, 2019, a moderator banned Jackson from Goodman's Discord server because Jackson was harassing others on the site.  Jackson did not harass Goodman; rather, Goodman noticed Jackson displayed "a very protective attitude toward maybe my purity.  For example, on Instagram somebody wrote a comment that they thought I was hot.  He would yell at them."

## A. Jackson's Emails

After being banned from Goodman's Discord site, Jackson began emailing Goodman every day for a month.  (We grant Jackson's unopposed June 29, 2020 motion to augment the record

with these emails.  We excerpt the emails in italics without changing their original capitalizations or punctuation.)

Jackson started the day after the moderator banned him from Goodman's Discord chat room.  In his first email, which is lengthy, Jackson complained to Goodman about the ban and asked her to reinstate him.  He also *invite[d her] to [his] private-server hosted on github, with the intention of delivering to [her] highly-sensitive, top-secret, developmental specifications, to conceive an invitation for [pursuing] a work-related relationship, in a classified industrial description.*

He told her, *you are beloved . . . .  i would like to consider you and i two sides of the same coin, which, in the end would ultimately depend on your judgment regarding the potential risks and rewards.  i see no need to perceive limits to my capabilities, or my impression of your own, no matter if we grow together or apart.*

Jackson then claimed he worked for the military as a spy: *as for my background:  i am a twenty-seven year old male, and my specialties are information gathering, cybernetic engineering (the study of systems, the study of observing systems, and machine-human relationships), and espionage.  i was sworn into the u.s. department of defense at 18 years old, to work in intelligence, later i honorably discharged from my branch, due to contractual issues and lackadaisical leadership structure; then and now, i consider myself a patriot through and through.  as you know, i've been to 19 countries, and during that time i gathered the international significance for my current operation.  i work in carefully planned out stages, and I believe that you deserve the chance to make a choice to escape the vortex of the current system, with the virus that i developed. . . .*

Jackson suggested Goodman join him in a *working relationship* on a product that *will be worth trillions as we near our 60s. if you decided to work with me: the journey from our mid-twenties to our senior age and what we can accomplish in that time is worth more than all of the money in the world. there are also two means to that financial end, where either course of action would be determined by you, and can be intermittent depending on your emotional needs.*

Goodman did not respond to this message. She felt uncomfortable because she perceived Jackson felt he had some sort of personal relationship with her.

Goodman's Discord site never reinstated Jackson. However, Jackson remained able to interact with Goodman on Twitch.

After this May 28 email, Jackson continued emailing Goodman daily, and sometimes more than once a day. He would wake up and, as part of his routine, send Goodman an email. Jackson often emailed Goodman between 5:00 and 6:00 a.m. He signed most emails with a heart emoji and "the best regards, deusxmachina303."

Goodman opened the first few emails, but they made her uncomfortable. She showed them to her producer and then began to archive Jackson's emails as they arrived.

We excerpt a handful of Jackson's emails to Goodman.

*Sat, Jun 1, 2019 at 5:49 AM*
*good morning syd..*
*fun fact: I've hacked the system so much, that I am technically a nameless hindu god . . . .*
*have a great day..*

5

*[heart]*
*the best regards,*
*deusxmachina303*

At trial, Jackson testified he referred to himself as "technically a nameless Hindu god" as part of his religious expression. He testified he is the reincarnation of a Hindu god, and he has a group of people who view him as the reincarnation of a Hindu god.

*Sun, Jun 2, 2019 at 5:32 AM*
*good morning syd..*
*I hope that your day is as magical as you are..*
*fact: secret skills are the best defense against the dark arts..*
*[heart] . . . .*

*Mon, Jun 3, 2019 at 5:32 AM*
*good morning syd..*
*i hope that your day feels fulfilling..*
*fact: if I ever inexplicably disappear, [it's] best to assume that I've been assassinated..*
*[heart] . . . .*

*Mon, Jun 3, 2019 at 8:04 AM*
*hey syd..*
*fact: the only thing that i ever "worry" about is that if i got killed off, in the near future, you'd have no way of finding out..*
*if I die like a **mitch**, don't mourn me, cause i would have been weak..*
*[heart] . . . .*

Jackson testified the unfamiliar word in the last paragraph, which we have emphasized, means "a man bitch who dies because he wasn't strong enough to survive."

*Fri, Jun 7, 2019 at 6:04 AM*
*good morning syd.. . . .*
*we already live in the apocalypse.. society and its standards are all an illusion. . . . we are biologically ordered made to be a successful pair, or we will inevitably be killed [off] by natural selection..*
*[heart] . . . .*

*Sat, Jun 8, 2019 at 6:54 AM*
*good morning syd..*
*I hope that your day is swank, today..*
*fact: I fell asleep writing a burn, and in my dreams, you and i were planting a community garden.. while building relationships with neighbors, and their kids who looked up to us..*
*[heart] . . . .*

*Wed, Jun 12, 2019 at 5:55 AM*
*good morning syd..*
*I hope that your day is high spirited, today.. . . .*
*guerrilla warfare suits my personality traits..*
*[heart] . . . .*

Jackson testified, "Guerrilla warfare is the art of surprise-attacking in a terrain where clear lines of sight cannot be made."

*Thu, Jun 13, 2019 at 6:59 AM*
*good morning syd..*

*i hope that your day is filled with revitalizing energy, today..*

*fact:  i have 3 [recurring] nightmares, some that i haven't had for years..  (the little boy blue kills my entire family, before I can get home; my "voice" is silenced; and, facing-off against an indestructible enemy)..  I have a general rule about not engaging in combat, unless a certain condition is met..  however, there are 2 people who I want to go "hand-to-hand" with, in a trustworthy fight simulation..  ((neo (keanu reeves), and my ambiguous life-partner)).. . . .*

*[heart] . . . .*

*Fri, Jun 14, 2019 at 5:40 AM*
*good morning syd..*
*I hope that you have a fantastic day, today..*
*fact:  I consider this my home, now..  once I turn my back, I'm gone forever..  In fact, because of the way that I travelled and lived my life previously, there's no positive id of who I am or what happened to who I was..  the hardware and accounts that I have are all dark..*
*[heart emoji] . . . .*

*Sun, Jun 16, 2019 at 8:06 AM*
*good morning syd..*
*i hope that your day is as awesome, as you are.. . . .*
*when i moved back to dc, i had it in my mind to change the world, so i eventually reverse-engineered the global economy and developed a virus that would modify society in ways that "everyone" intrinsically wants.. . . .  then, once i began the process*

8

*of executing the system, as a consequence i became the anti-christ .
. . . i am just as loyal, as i am exacting..*

*[heart] . . . .*

*Wed, Jun 19, 2019 at 8:30 AM*
*good morning syd..*
*i hope that you have a platinum level day, today.. . . .*
*i'm very glad to be here.. I also, think that it would be fair
to show you what I look like, in person, at this point . . . .*

*[heart] . . . .*

Jackson appended three pictures to this email. Two show
his masked face. In one Jackson also wears sunglasses. The
third picture shows Jackson without a mask or sunglasses.

**B. Jackson's Conduct on June 22 and 23, 2019**

On Saturday, June 22, Jackson traveled from Ontario,
California, to Goodman's apartment in Los Angeles, a distance of
about 50 miles.

Before traveling, Jackson sent Goodman this email:

*Sat, Jun 22, 2019 at 6:47 AM*
*good morning syd..*
*i hope that you have a wild day, today..*
*. . . i grew up in the woodland area of the eastern u.s.
mountain region (and, the district is built on top of swampland),
which means that as an adventurous youngling and seasoned
adult, i found a suitable environment for crafting tools, tracking
targets, and navigating new territory.. while i was hunting, last
night i remembered how i was telling you about how the darknet
works, because of the anti-tracking nature of what lies beneath of
the restricted areas for the internet, that depend on the country;*

9

*therefore, i decided to make a tutorial..  I'll send it to you, in a bonus email, this afternoon.. . . .*

    *[heart] . . . .*

    In the afternoon of June 22, Jackson knocked on the front door of Goodman's second-story apartment.  Goodman's building has four apartments:  two on the ground floor and two on the second floor.

    Goodman's husband Alex Rubens looked through a window in the door and saw a man wearing a mask and a fully hooded coat on this June afternoon.

    Rubens said, "What's up?"

    Jackson said, "Is Syd there?"  Syd is Goodman's nickname; her close friends or online fans use this nickname.

    Rubens said, "No.  Please leave."

    Jackson said, "I'll just wait here."

    Rubens said, "You need to leave.  You're trespassing."

    Jackson said, "Okay.  I'll just come back later."

    Rubens said, "The F you will.  Get the F out of here right now."  Jackson did not leave.

    Jackson did not say why he wanted to see Goodman.  He did not leave; he stayed on the second floor landing playing video games.

    Rubens was fearful because Jackson was wearing a mask and would not leave.

    A neighbor saw Jackson there about half an hour later.

    Rubens called the police, who took about an hour to arrive.  By that time Jackson had left.  Police drove around the block and did not see Jackson.

Rubens went to Best Buy, bought security cameras and a doorbell tied to them, and installed the camera system that afternoon.

That same afternoon, Jackson sent Goodman this email:

*Sat, Jun 22, 2019 at 4:06 PM*

*hey syd..*

*i have to email you that tutorial for the darknet, tmrw.. i had to make moves.. it will still be bonus content..*

*[heart] . . . .*

At trial, Jackson testified "i had to make moves" meant Jackson "had indeed tried to possibly find [Goodman] to see if she was okay."

At 9:45 that evening, Jackson returned to Goodman's and Rubens's apartment, again wearing a mask. Jackson introduced himself as "Deus." By now, Rubens knew Deus was somebody who had been emailing Goodman. Rubens told Jackson to wait for Goodman to arrive, because police said they would have a better chance of contacting Jackson that way.

Rubens phoned police that Jackson had returned. Rubens told them Jackson was harmless but had mental issues. Rubens told them he suspected Jackson might have Asperger's or autism. Rubens said this at Goodman's behest; she feared police otherwise would "walk up and shoot" Jackson.

Police arrived in 10 minutes with two patrol cars and two helicopters. One helicopter shined a spotlight down on Jackson, who stood playing a video game.

Police handcuffed Jackson, sat him in a cruiser, and asked why he was there. Jackson said he had to handle something with Goodman's husband in regard to Goodman. Jackson said Goodman had been acting differently via social media. The police

tried to get more details, but Jackson's answers were "very facetious and disrespectful." Jackson did not respond to police questions with appropriate answers. Jackson instead spoke about how realistic video games are and was checking out gear inside the police car.

The officers told Rubens he could give Jackson a verbal warning. Rubens went to the police car and addressed Jackson: "I told you once, I will tell you again. I never want to see you here again or I will call the cops."

Jackson replied, "Actually I'm very lucky. I am very [lucky] because I have tons of information contained in this—in this little teeny, tiny space. Thank you. Thank you very much."

Rubens took this statement as a threat because Jackson had "learned information about us. He learned information about our street and he would use it going forward."

Jackson told Rubens, "well, you called the cops this time." Jackson got angry and started yelling at Rubens.

Police separated Jackson and Rubens.

A police officer said she decided to warn Jackson at that point rather than arrest him. "I didn't want to arrest him, although he did create multiple radio calls. . . . I wanted to give him a chance."

Police warned Jackson not to return to that area or he would be trespassing. Jackson disputed he was trespassing. Police also gave Jackson a written trespass warning, took him five houses away to a nearby intersection, told him not to get closer to Goodman's apartment, and left him there. The officers watched Jackson put his mask and hood back on.

When police circled back in five minutes, Jackson was still at the intersection, although he had crossed the street. Police departed. Rubens was irate they left Jackson so close.

Jackson spent the night sleeping on the grass at that intersection. Then he went to a nearby Starbucks.

The next day was Sunday, June 23.

At 5:33 a.m. on Sunday, Jackson sent Goodman an email from the Starbucks. At trial, Jackson claimed he sent this email to explain to Goodman "[h]ow a search algorithm works in practical terms." We excerpt this message:

*Sun, Jun 23, 2019 at 5:33 AM*

*good morning syd..*

*i hope that you have a spectacular day, today..*

*fact: tracking moving target, such as a ball or an animal, is a very intuitive process for human beings, so [its] mechanics can easily be taken for granted, and not developed as a skill.. the first thing that is needed to find a moving object is data.. . . . the second thing that is needed is a search vector.. . . . these vectors are all based on the data sets that you choose for the query.. you can find public databases online, and at the libraries to find people when large searches are being conducted, such as figuring out where someone lives.. [it's] a fun skill to practice, even around the office, to surprise attack co-workers.. and, become really good at it..*

*[heart]*

*the best regards,*

*deusxmachina303*

That morning, Goodman awakened Rubens to show him this new email from Jackson. The email scared Rubens because

it was about how tracking people and surprise attacks were Jackson's favorite things to do.

Goodman was afraid for her life.  She was crying and was trying to find a new apartment.  She "felt very trapped because I knew that he knew where I lived, but I felt afraid to go outside because I wasn't sure if he was watching me.  I felt so scared for my husband, and I just—I felt like I needed to find a new career path."  ". . . I felt like I could never imagine bringing kids into my life knowing that they're—sorry—that they're, like, at that kind of risk . . . .  [H]aving a family is something that's really important to me, and I just—it feels like I have to choose."

Goodman and Rubens went to a police station to report this development and to get an order prohibiting Jackson from being in their neighborhood.  They could not get this order on a weekend.

For the first time, Goodman responded to Jackson.  She emailed:  "Stop contacting me.  I have filed a restraining order, as has my spouse.  If you contact us or get anywhere near us, I'll call the police.  Sydnee Goodman."

Meanwhile, Jackson left the Starbucks and returned to the intersection.  He again went to sleep on the grass.

Rubens and Goodman were away from home later that Sunday when neighbors notified Rubens that Jackson again was near their apartment.  Rubens and Goodman called police and, before heading home, waited for word police were there.  On the way, Goodman had a panic attack and Rubens had to stop the car.  When they arrived back in their neighborhood, they saw police putting Jackson in the back of a car.  Police had arrested Jackson at the intersection where they had left him the night before, five doors from Goodman's apartment.

## C. Jackson's Defense

At trial, Jackson testified he never intended to threaten or scare Goodman. Jackson claimed he wore his mask for innocuous reasons, and he traveled to Goodman's place only to see if she was okay or whether Rubens was physically abusing her. In short, Jackson claimed his only motivation was noble.

Jackson testified he routinely wears his mask. It "protects me from bugs, from particles in the air, from the sun, from certain levels of radiation from the sun, it also protects me from facial recognition algorithms as well as being part of my religious expressions." Jackson also wore the mask to prevent drones from using facial recognition software to identify him "as a human." "I'm talking about weaponized microdrones or antipersonnel drones." His mask "prevents drones from being able to specifically target me during a possible terrorist attack." Also, the mask is "very comfortable. Like, it's like being hugged on your face. Consistently it helps you keep a—it helps you keep calm."

Jackson testified he wears the mask, sunglasses, and a hood as part of his religious expression.

Jackson sent the emails to help Goodman by giving her valuable information: "She could pay me for this."

Jackson denied any intent to threaten Goodman. In court he repeated this denial more than 25 times. He explained his June 23, 5:33 a.m. email about a "surprise attack" "just means giving a surprise on somebody . . . like, they surprised me with balloons."

Jackson told the jury he traveled to Goodman's apartment because he believed she might be the victim of domestic abuse.

He was concerned for her safety and he wanted to check to see if she was okay.

Jackson explained he had examined Goodman's video posts and saw three signs that she was in danger. First, Goodman had posted a picture on Instagram that included her glass table. Under the glass Jackson could see a pair of garden shears. Jackson concluded Goodman had stashed the shears there as a weapon to protect herself from her husband's domestic abuse.

Second, Goodman had posted another picture on social media. Jackson thought he saw a dark spot on Goodman's ankle, which he suspected was a bruise. (Goodman testified it was eczema.) Goodman also stumbled in a video that day. Jackson thought the dark spot and stumble suggested Goodman was injured. He suspected Goodman's husband might be abusing her.

Third, Goodman had posted a picture of her cat in front of her balcony. Jackson believed this was the first time Goodman had posted an image that showed the world outside her apartment. Behind the cat, the photo showed a view of the city outside Goodman's apartment.

This was an "abrupt deviation" from her normal practice of not revealing scenery outside of her apartment. Jackson believed Goodman might be letting people know where she was so she could be rescued.

On Friday, June 21, Jackson used Goodman's posted cityscape images to locate her Los Angeles apartment address. The next day, Saturday, June 22, Jackson traveled by bus from Ontario to Goodman's apartment. The trip took about three hours. Jackson arrived at Goodman's place around 1:00 or 2:00 o'clock in the afternoon. Jackson wore the mask on the journey.

16

Jackson knocked on Goodman's door.  No one answered, so Jackson played his handheld video game for a while.  He knocked again later and Rubens answered through a window in the door.  Jackson asked if Goodman was there.  Rubens said she was not and told Jackson to leave.  Jackson then walked to a nearby Starbucks.  He was on the premises for a total of about 30 minutes.

In terms of Jackson's physical movements, his testimony meshed with the prosecution's case-in-chief.  That is, Jackson left the apartment in the afternoon and returned that night.  Police that night warned him not to return.  Jackson slept at the nearby intersection where they left him, later went to the Starbucks, and finally returned to the intersection and slept again.  Police arrested him there for stalking.

The jury found Jackson guilty of one count of stalking pursuant to section 646.9, subd. (a).  The trial court sentenced him to five years of formal probation with various probation conditions, including that he attend mental health counseling twice monthly for a year.  He was ordered to serve 261 days in jail, for which he was given credit as time served.  Jackson timely appealed.

## DISCUSSION

### 1.  There Was Sufficient Evidence of a Credible Threat

Jackson contends there is insufficient evidence to support a finding that he made a credible threat in violation of section 646.9.  He claims his conduct was protected by the First Amendment and should be reviewed independently pursuant to *In re George T.* (2004) 33 Cal.4th 620, 632 (*George T.*).  The People disagree, pointing out that no case has extended

independent review to a stalking conviction. The People rely on *People v. Lopez* (2015) 240 Cal.App.4th 436, 447 (*Lopez*). In *Lopez,* the court held credible threats under section 646.9 " 'pose a danger to society and thus are unprotected by the First Amendment.' " (*Id.* at p. 453.)

Following *Lopez,* we decline to resolve the issue of which standard of review to apply because we would affirm under either standard. We thus apply both deferential and *George T.*'s independent review.

Section 646.9, subdivision (a) provides: "Any person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year, or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison."

Subdivision (g) of section 646.9 defines a credible threat as: "a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety or the safety of his or her family, and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat. . . . Constitutionally

18

protected activity is not included within the meaning of 'credible threat.' "

Substantial evidence shows Jackson made a credible threat.  Jackson's emails spoke of the possibility Jackson and the "beloved" Goodman would "grow together," were "two sides of the same coin," and together would plant "a community garden" while "building relationships with neighbors, and their kids who looked up to us."  He told Goodman, "[W]e are biologically ordered made to be a successful pair, or we will inevitably be killed [off] by natural selection."  Jackson wrote of espionage, assassination, his "dark" hardware and accounts, his guerrilla warfare, and of being "killed off, in the near future."  Jackson also stated "we already live in the apocalypse";  "secret skills" were the best defense against "dark arts"; and he would become the antichrist who was loyal and "exacting."  He relayed the nightmare of his entire family being killed off, and of hand-to-hand combat with his "ambiguous life partner."  He claimed to be skilled at "tracking targets" and "hunting."

After writing these statements every day for a month, Jackson appeared in person, at Goodman's front door, wearing a hood and mask on a summer afternoon in a desert climate, and asked for "Syd"—a nickname used by friends and Goodman's online audience.  Rubens correctly surmised an anonymous online viewer somehow found their home.  Jackson said nothing to allay Rubens's instant concern.  Rather, Jackson refused to leave when ordered; loitered on the interior second floor landing of the small apartment building playing a video game; vanished before police arrived; and returned after dark, at about 9:45 p.m. that evening, still masked.  Police and Rubens ordered him off

19

again, without equivocation, but Jackson spent the next 20 hours lurking at the line police had drawn.

The next morning Jackson sent Goodman his email about tracking moving targets based on online data. "[It's] a fun skill to practice, even around the office, to surprise attack co-workers" and "become really good at it."

Jackson testified he merely wished to explain how a search algorithm works in practical terms. The context cuts against Jackson. He wrote this final email at a Starbucks near Goodman's place, at 5:33 a.m., after a three-hour bus journey, after two encounters at her apartment, both of which involved demands for Jackson to go away and stay away, after a police helicopter spotlighted him, after police handcuffed him and warned him off, orally and in writing, and after Jackson spent the night sleeping on the grass five doors from Goodman's apartment—as close as police would permit. The context was Jackson's determined and menacing intrusion, not a seminar on algorithms.

In context, the reasonable reading of this email was what Goodman thought it was: Jackson was telling Goodman, *I can find you. What happens next is up to me. You are not safe.* Jackson calculated his conduct, culminating with his 5:33 a.m. email about tracking and surprise attacks, to instill fear in Goodman. As we have described, substantial evidence supports the jury's finding that Jackson made a credible threat with the intent to place Goodman in reasonable fear for her and her husband's safety.

To avoid the substantial evidence we have described, Jackson claims the standard of review should be that enunciated in *George T. George T.* was a criminal threats case under section

20

422, which is a different statute than the stalking proscription in section 646.9. *George T.* held the First Amendment protected a high schooler's poem because it was too ambiguous to amount to a criminal threat. (*George T.*, *supra*, 33 Cal.4th at p. 638.) "[E]xactly what the poem means is open to varying interpretations because a poem may mean different things to different readers. As a medium of expression, a poem is inherently ambiguous." (*Id.* at p. 636.) "[T]he poetry of Sylvia Plath, John Berryman, Robert Lowell, and other confessional poets" depicted " 'extraordinarily mean, ugly, violent, or harrowing experiences.' " (*Id.* at p. 638.) The poem in *George T.* followed that tradition and enjoyed First Amendment protection against a criminal threats prosecution under section 422. The poet won.

The *George T.* decision formulated a mixed standard of review to safeguard the free speech right at stake. The standard was mixed because the reviewing court must *defer* to the jury's credibility determinations but also must conduct an *independent* review of the whole record to ensure the judgment did not intrude on free expression. The *George T.* type of independent review, however, is *not* "the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different." (*George T.*, *supra*, 33 Cal.4th at p. 634.) This is so because, compared to an appellate court, the fact finder at trial is in a superior position to observe the demeanor of witnesses, and its credibility determinations are thus not subject to independent review. (*Ibid.*)

The *Lopez* court wrote that, as between the substantial evidence standard and the *George T.* mixed standard, "We do not

21

find it necessary to determine which standard applies in the present case because we would affirm under either one." (*Lopez*, *supra*, 240 Cal.App.4th at p. 447.) *Lopez* noted that "if independent review is appropriate, it is applicable only to issues that could implicate the First Amendment, such as the content of the appellant's communications; sufficiency of the evidence to support the jury's finding on intent is determined according to the usual substantial evidence standard." (*Ibid.*) Like Jackson, the *Lopez* defendant claimed his communications with the victim were not "true threats," meaning they were not expressive conduct that communicated an intent to commit a violent act. Thus, they were protected by the First Amendment. (*Id.* at p. 448.)

The *Lopez* court rejected this characterization of his communications with the victim. Although he never explicitly threatened the victim, the record disclosed he "was obsessed with [the victim] over a period of many years, contacted her repeatedly despite her efforts to stop him directly and through involving the police, and made clear both that he knew where she lived and where she went, and that he would not accept her ending what he perceived to be their relationship." (*Lopez*, *supra*, 240 Cal.App.4th at p. 452.) The court concluded a reasonable person would understand his communications and conduct to be threatening. "Such threats 'pose a danger to society and thus are unprotected by the First Amendment.' " (*Id.* at p. 453.)

Under *George T.*, our review of the record as a whole shows Jackson's communications with Goodman did not fall within the protection of the First Amendment. First, we accept the jury's credibility determinations. The jury's rejection of Jackson's credibility logically and likewise entails rejection of his noble "I

22

just went to ensure Syd was okay" motivation.  When Jackson claimed his motivation was benign and the jury did not believe it, the reasonable inference is Jackson's true motivation was not benign.  In context, Jackson's "tracking" email was not benign; it was a veiled but transparent threat:  *I can find you.  What happens next is up to me.  You are not safe.*  Jackson's threat was implied and general but clear in context.  It threw Goodman into a panic.  Her reaction was reasonable.  Just as in *Lopez,* a reasonable person would understand Jackson's communications to be threatening; they fall outside the protection of the First Amendment.

## 2.  There Was Sufficient Evidence Jackson Intended to Instill Fear

Jackson also contends the evidence was insufficient to prove he intended to instill fear in Goodman.  Again, we disagree.

Here, the jury rejected Jackson's benign explanation of his own motivation.  Jurors had an ample basis for inferring Jackson's purpose indeed was to threaten and frighten Goodman, as we have set forth.  (*People v. Falck* (1997) 52 Cal.App.4th 287, 299 ["it can be inferred that appellant intended to cause fear in the victim from the fact that he insisted on maintaining contact with her although she clearly was attempting to avoid him, and although he had been warned away by the police, the court and the victim's husband"].)  Because the evidence was abundant, we have no occasion to evaluate whether some lesser mental state than purpose would satisfy this statute.

### 3. The Trial Court Did Not Abuse Its Discretion in Denying the Request to Reduce Jackson's Offense to a Misdemeanor

Jackson next contends the trial court should have reduced his conviction to a misdemeanor. We disagree.

Section 17, subdivision (b) allows a court to reduce a wobbler conviction from a felony to a misdemeanor by considering "the nature and circumstances of the offense, the defendant's appreciation of and attitude toward the offense, or his traits of character as evidenced by his behavior and demeanor at the trial." (*People v. Morales* (1967) 252 Cal.App.2d 537, 547.) On appeal, we review the trial court's decision for abuse of discretion. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977–978.) " 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' " (*Ibid.*)

After the verdict and in preparation for the sentencing hearing, the trial court said its goal was to ensure Jackson did not contact Goodman or Rubens again, and that, rather than prison, "probation is a far better way to handle the case." The court commented that a "lengthy period of probation" would allow the court to see how Jackson was doing, "because I think he's someone who is intelligent and may be able to understand."

The sentencing hearing was October 31, 2019. Goodman sent a written statement. Rubens spoke. The prosecution asked the court to sentence Jackson to prison. Jackson's attorney asked the court to reduce his felony conviction to a misdemeanor. The

24

court rejected both these requests and sentenced Jackson to five years of probation.  The court ordered Jackson to return to court in two months.

The trial court declined to exercise its discretion to reduce the conviction to a misdemeanor.  "I note I watched the defendant here in court. . . .  This court believes that this situation in which [Jackson] finds himself is a game and that he's not accepted responsibility for his actions.  If he did, he would have left the first time he went to Ms. Goodman's and Mr. Rubens'[s] home.  He would have left when the police contacted him later that night instead of walking to a Starbucks, instead of walking anywhere.  He sat within four houses because that's exactly where the police told him he had to stay, the minimum amount away.  He terrorized both Ms. Goodman and Mr. Rubens.  This court believes his actions are indeed a felony and not a misdemeanor."

Jackson's attorney argued Jackson deserved misdemeanor treatment because the stalking was not aggravated.  "So if this isn't misdemeanor stalking, what is?"

The court responded, "I entirely disagree with you.  Ms. Goodman and Mr. Rubens were totally unknown to the defendant . . . .  [T]here are plenty of misdemeanor stalkings that this court has seen and believes appropriately [were] misdemeanors.  [¶] He sent her notes, emails I should say, over a period of time of four to five months from what the court can tell, and at some point that escalated.  It escalated so that he actually had to figure out where they lived.  When that address was never posted, . . . he had to actually actively search out where she lived.  And then he shows up on her doorstep wearing a balaclava and a hood after showing her pictures of the balaclava and hood a few days earlier.  [¶]  When he's told she's not there, he comes back late at

25

night I might add.  I think it's 9:30 at night when he shows up, and he's told to go away at that point in time.  He still chooses not to leave.  He still chooses to push the envelope as far as it can go and literally for the next approximately 20 or so hours is on the street corner nearest to where Ms. Goodman and Mr. Rubens live.  If that's not terrorizing, if that's not felony terrorizing, I don't know what is."

The court added, "I'm sorry that his financial aid will be impacted.  I'm sorry that his education might be impacted because it's clear Mr. Jackson is incredibly smart."

Jackson's counsel persisted:  "He's not a bad person, Your Honor.  I've interacted with him.  He's a good person."

The court responded:  "I don't know because good people do not harass and threaten people in the manner that he did.  I think if you look at his life as a total—a totality of who he is, if you look at the fact that he is clearly incredibly well educated and well versed, I might agree with you.  But I don't know him from any other human being.  I hope he's a good person, but what I see is someone who has significant mental health issues.  I can't tell you what those are.  But they're mental health issues."

"When the prosecutor asked him questions on cross-examination, it was a game.  When I told him to follow my instructions on the stand, it was a game.  He took one word and made it a semantic game.  I don't know if he's going to follow any orders of probation and just push the envelope.  I hope that's not the case."

The court imposed a 10-year stay away order and mental health counseling twice monthly for at least a year.  The court ordered Jackson to surrender passwords to enable searches of his computer.

The court concluded the combination of probationary conditions "gives me much more control to change his behavior. And ultimately, my goal's to not have him back here in court other than on this case. I don't want any new offenses from him."

Jackson claims the trial court did not give individualized consideration to the offender, the offense, and the public interest. The record is to the contrary. On appeal, Jackson attempts merely to reargue his trial position, which his trial lawyer outlined with admirable force and clarity. The trial court thoughtfully considered and rejected this presentation, using an analysis taking full account of Jackson as an individual, of his offense, and of the public interest. We find no abuse of discretion.

## DISPOSITION

The judgment is affirmed.



WILEY, J.


We concur:



BIGELOW, P. J.



STRATTON, J.