Filed 9/6/24  P. v. Godinez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIANO ANGEL GODINEZ,<br><br>    Defendant and Appellant. | E081149<br><br>(Super.Ct.No. BAF2200473) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARIANO ANGEL GODINEZ,<br><br>    Defendant and Appellant. | E081150<br><br>(Super.Ct.No. BAF2200506)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge.

Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Monique Myers, Deputy Attorney Generals, for Plaintiff and Respondent.

Defendant and appellant Mariano Angel Godinez jumped over a fence into the backyard of a house in Hemet that belonged to M.C. (Homeowner) while Homeowner was out of the house running errands. Defendant entered a sunroom attached to the house and tried to access the house through a sliding glass door. When he discovered the sliding glass door was locked, he went out of the sunroom to the backyard to try to access the house through a door to the garage, which was attached to the house. He tried to get through the door leading to the garage by kicking it, throwing a brick at it, and using a shovel and a long board to pry the door open. All of defendant's actions were recorded on Homeowner's security cameras. Homeowner called the police and defendant was arrested while still in Homeowner's backyard. Defendant was found guilty of burglary and attempted burglary.

Defendant claims on appeal that his convictions of burglary and attempted burglary are not supported by substantial evidence that he acted with the requisite intent to commit theft when he entered the sunroom and tried to open the garage door.

## FACTUAL AND PROCEDURAL HISTORY

A.     PROCEDURAL HISTORY[1]

Defendant was convicted of burglary of an inhabited dwelling house (Penal Code, §§ 459, 460, subd. (a).)[2]; and attempted burglary of an inhabited dwelling house (§§ 664, subd. (a), 459, 460, subd. (a)).  In addition, in a bifurcated proceeding, the trial court found, after defendant waived his right to a jury trial, the allegation that he committed the offenses while out on bail within the meaning of section 12022.1, subdivision (b), to be true.[3]  Defendant was sentenced to a state prison term of six years.

B.     FACTUAL HISTORY

1.     *PROSECUTION CASE-IN-CHIEF*

On May 3, 2022, Homeowner lived in a house located on Carmel Way in Hemet. He lived by himself.  A six-foot fence surrounded the Property.  His closest neighbor was 100 feet away.  He had a pool in the backyard.  He had security cameras that recorded the

---

[1] Defendant pled guilty in Riverside County Superior Court case No. BAF2200473 to felony vandalism and the trial court sentenced him to two years to be served in state prison concurrent with the sentence in case No. BAF2200506.  Defendant appealed the vandalism plea in case No. E081149, which was consolidated with case No. E081150.  Defendant concedes that the plea form included that he waived his right to appeal and that no certificate of probable cause was obtained.  Accordingly, this appeal discusses only the conviction in Riverside County Superior Court case No. BAF2200506 and the only references to the record on appeal are to the record in case No. E081150.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] Defendant was also charged with the aggravating factor that he had served a prior prison term within the meaning of section 1170, subdivision (h).  The allegation was dismissed by the trial court at the time of sentencing.

areas around his house, including the backyard.  He was able to view the security camera footage on his phone when he was away from his house.

On that day, Homeowner left his house to run errands.  He believed that he had locked all his doors.  While he was out, he noticed on his phone that someone was in his backyard.  The person was kicking one of the doors.  He immediately called the police.  When he arrived home, there were several police cars in front of his house.  He saw them take a person in handcuffs away from his house.  He identified the person as defendant.  Homeowner did not know defendant and had not given him permission to be at his house.

Homeowner reviewed the security camera footage from that day.  He saw defendant move throughout his property in the pool area and a separate yard area.  He entered an enclosed sunroom and tried to open a door into the house.  He then went to another door that led to the garage and kicked the door.  Homeowner never saw defendant swim in the pool.  He provided the security camera footage to the police.  It was shown to the jury.

In the video footage, defendant could be seen entering the sunroom that was attached to the house.  He was wearing pants, a jacket, a hat, and what appeared to be a paper surgical mask.  He tried to open a sliding glass door that led into the house.  The door was locked and he could not get inside.  He left the sunroom, took off his jacket, walked around the pool area, and then returned.  He walked past the sunroom to another area of the yard.

4

Another security camera view showed defendant in another yard area where there was a garage door that was attached to the house. He first tried to kick in the garage door. He kicked at the door three times. Defendant walked to the back of the yard near the fence that was next to the street. He picked up a brick and returned to the door. He looked around before he hit the door with the brick several times. He hit the door handle with the brick several times. He backed up and threw the brick at the door. He then kicked it several times. Defendant picked up a shovel and hit the door with it. He then appeared to try to pry the door open with the shovel. When it did not work, he dropped the shovel and kicked the door again. He walked around the yard and appeared to be frustrated. He tried using the brick again, hitting the door and the door handle. He kicked the door several more times. Defendant walked to the back fence again and returned with a large/long board. He hit the door with the board several times and tried to pry the door open with the board. He dropped the board and tried to open the door with some sort of small metal object and an alarm sounded. The video ended at this point.

Hemet Police Officer Hobson was on duty doing patrol around 3:20 p.m. on May 3, 2022. He was called to Homeowner's house regarding a burglary in progress. When he and his supervisor arrived at the house, they observed defendant standing in the backyard of Homeowner's house. Officer Hobson instructed defendant to hop over the fence out of the backyard. When defendant did not comply, Officer Hobson and his supervisor jumped over the fence into the backyard. Officer Hobson instructed defendant to put his hands behind his back and defendant complied; he then advised him to get on the ground. He put handcuffs on defendant. Defendant did not exhibit any behaviors

5

suggesting that he was hallucinating or that he was a danger to himself or others. Defendant was not wet when he was apprehended. The garage door was "extremely" damaged. Defendant was searched when he was arrested and nothing was found on his person.

Officer Hobson did not recall if the security alarm was sounding when they arrived. He agreed that most burglars would leave the area when an alarm sounded but defendant was at the house when they arrived. Officer Hobson also agreed it was common for burglars to bring tools with them but defendant was found with nothing on his person. Defendant had no means of transportation that Officer Hobson was aware of in order to leave the scene. There was no surveillance video showing what defendant had done on the property prior to entering the sunroom. There were no signs of forced entry into the sunroom. There were no broken windows at the house.

Homeowner indicated that defendant would be able to see inside the house through the sliding glass door that was between the sunroom and the house. He would be able to see the television and other valuables. There was $700 of damage done to the garage door. Homeowner did not believe that defendant stole anything. Homeowner had never given defendant permission to come to his house or to swim in the pool. There was no security camera footage of defendant using the pool that day.

2.    *DEFENSE*

On May 3, 2022, defendant was homeless, but up until Christmas 2021, he had lived with his mother. His stepfather also lived with his mother until Christmas 2021. Defendant and his stepfather both left his mother's house at the same time after they got

into an argument. He was actively looking for his stepfather and believed he was living somewhere in Hemet.

Defendant went to Homeowner's house on that day to go swimming. He walked to the house. Defendant had been to the house a few weeks prior with a friend and they both swam in the pool for five or 10 minutes. No one was at the house that day and he did not know who lived in the home.

On May 3, 2022, defendant went to the house alone. He did not go to the front door. He went to the back and jumped over the fence. Defendant took off his clothes—except for his underwear—and swam in the pool for five minutes. After swimming, he went into the sunroom because he "wanted to." The sunroom doors were not locked. He noticed through the window that looked into the house a jacket that looked like his stepfather's jacket. He observed a house telephone that looked like one that his stepfather owned. He also saw a burrito on the counter which was rolled the same way that his stepfather made his burritos. At this point, he thought his stepfather may live in the house. He could not access the house through the sunroom because the sliding glass door leading from the sunroom into the house was locked. He did not take anything from the sunroom.

Defendant went around to another part of the yard and found the garage door. It was locked. He started hitting the garage door because he was mad. He was mad because he thought that his stepfather was hiding from him. He was not worried when the alarm went off because he thought it was his stepfather's house. When the police

arrived, he told the police that he had been swimming and that he was looking for his stepfather.

Defendant spoke with three doctors about his case. He told them he was at Homeowner's house to find his stepfather. He admitted that he no longer believed that he was at his stepfather's house because he was arrested and charged in the case. He did not take any property from Homeowner's house and did not intend to take any property.

Defendant admitted to having suffered two prior felony convictions in 2013 and 2018. When defendant was at Homeowner's house the prior time he did not see his stepfather. On May 3, he was trying to get the garage door open to go inside and talk to his stepfather. He did not go to the front door even though he thought it was his stepfather's house. He never called out his stepfather's name even though he thought it was his house.

Dr. Herbert Valle had a doctorate in clinical psychology. He worked at Patton State Hospital as a staff psychologist. He also completed competency evaluations for the Riverside County Superior Court. Dr. Valle was appointed by the trial court to complete a competency evaluation of defendant prior to trial. Dr. Valle had reviewed some of defendant's jail records, including mental health evaluations. He explained that symptoms of mental illness do not present the same every day.

Dr. Valle interviewed defendant. When he met with defendant, his speech was clear and his thinking was linear. He exhibited some delusional thinking. He was calm and cooperative during the interview. Dr. Valle concluded that defendant suffered from

8

unspecified psychosis, not due to substance abuse or a known psychological condition. Some particular features of unspecified psychosis included hallucinations and delusions.

Defendant did not express any grandiose delusions, which Dr. Valle described as a belief that a person has a special gift or power. Defendant mostly displayed delusional thinking. Dr. Valle admitted that the symptomology of mental illness could change day-to-day in a person suffering from a mental illness.

Defendant expressed what Dr. Valle presumed to be delusions about the burglary and attempted burglary. Dr. Valle could not determine when defendant began experiencing symptoms of unspecified psychosis. Dr. Valle did not think a person could determine that defendant suffered from a mental health illness by speaking to him for only a short period of time. Dr. Valle in speaking with defendant found him coherent and "pretty logical." However, it was after a time that his delusions were apparent.

Dr. Valle did not review the police records or security camera video from this case. A person with unspecified psychosis could recognize the difference between right and wrong most of the time. They were also capable of lying. Some of the delusional thinking that defendant exhibited while speaking with Dr. Valle was that he was at his stepfather's house and Homeowner's house. The fact that defendant was now aware he was not at his stepfather's house, based on his testimony, Dr. Valle opined that it was possible that defendant was using drugs at the time of the incident rather than a mental illness causing his delusions. However, without speaking with defendant it was impossible to know why he changed his mind.

9

The parties stipulated as to what Dr. William Jones, also a clinical psychologist, would testify if called as a witness. Dr. Jones completed a report after he was appointed by the Riverside County Superior Court to do a mental competency evaluation of defendant prior to trial.

As part of his evaluation, Dr. Jones reviewed the jail mental health records and interviewed defendant. Dr. Jones concluded that defendant was in a manic aspect of a bipolar disorder with psychotic features. Some features of his bipolar disorder in a manic state included pressured speech, distractibility, disorganized behavior, hallucinations, and delusions. During the interview defendant displayed distractibility, grandiose thinking, incoherency, and he became increasingly agitated. Dr. Jones reported that defendant was guarded throughout the interview and underreported his symptoms of mental illness. Dr. Jones did not believe that defendant was malingering.

## DISCUSSION

Defendant contends there is insufficient evidence to support his attempted burglary and burglary convictions. He claims the evidence established that he was suffering from a delusion that Homeowner's house belonged to his stepfather and that he did not possess the intent to steal.

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence

10

that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

Burglary requires entry into "any house . . . with intent to commit grand or petit larceny or any felony." (§ 459.) Section 664 further states that "[e]very person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished." One can be found guilty of burglary even if no "theft actually is committed." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041-1042.) Intent is " 'rarely susceptible of direct proof and must usually be inferred from all the facts and circumstances disclosed by the evidence.' " (*People v. Falck* (1997) 52 Cal.App.4th 287, 299.) " 'Where the facts and circumstances of a particular case and the conduct of the defendant reasonably indicate his purpose in entering the premises is to commit larceny or any felony, the conviction may not be disturbed on appeal.' " (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245.)

The jury could reasonably conclude that defendant had the intent to commit theft when he entered the sunroom. His intent was shown by the fact he did not knock on the front door to gain access to the house and entered the property by jumping over the back

11

fence. The fence was six feet tall and obscured the backyard from view. He was wearing a hat and a surgical mask making his face hard to see in the videos, which reasonably could be interpreted to show he did not want to be identified. Although defendant claimed he was there to swim in the pool, none of the security cameras showed him in the pool and none of his clothes were wet when the police arrived. Defendant entered the enclosed sunroom that was attached to the house because he "wanted to." While there were no valuables in the sunroom, once he went in the sunroom he could see inside the house and the house contained televisions and other valuable items. He tried opening the sliding glass door to enter the house to complete the theft, but the door was locked. The jury could reasonably reject that he had the intent when he came to Homeowner's house just to use the pool at the house, but rather he had the intent to commit theft.

Importantly, defendant claimed that he started to believe that the house belonged to his stepfather when he looked through the sliding glass door into the house and saw the jacket and the burrito. At this point, he was already in the attached sunroom and admitted he entered because he "wanted to." Viewing the evidence in the light most favorable to the prosecution, it established that defendant gained access by jumping the fence and entering the sunroom with the intent to commit theft.

Further, there was strong evidence that defendant intended to commit theft by breaking down the door to the garage in order to access the house. Defendant initially tried to kick in the garage door but was unsuccessful. He then stopped, walked to the back of the yard, and retrieved a brick. He looked around before he used that brick to hit the door and the door handle, and then threw it at the door. He did not give up or, if he

12

really believed that his stepfather was inside, call to stepfather to let him into the house. Instead, defendant went to the back of the yard and retrieved a large board. He hit the door multiple times with the board and tried to pry open the door with the board. He also used a shovel he found to try to pry open the door. Nothing deterred him from his quest to break through the door and enter the house. The jury could reasonably conclude that defendant lied about thinking that his stepfather was inside and that his actions were strong circumstantial evidence of his intent to commit theft.

In his opening brief, defendant primarily argues that this case is unlike *People v. Myles* (2023) 89 Cal.App.5th 711 (*Myles*). He insists that in *Myles* there was evidence that the defendant had broken a window to gain access to the home, unplugged the security system once inside, and drank a beverage or ate food while in the house. Since none of these actions occurred in this case, there was insufficient evidence that he had the intent to commit theft to support both the burglary and attempted burglary convictions. In addition, defendant only wanted to get into the house to speak with his stepfather and not to commit theft.

In *Myles*, the defendant broke a window and entered an unoccupied house. He remained inside the house for 15 hours. He drank a juice box and ate ice cream belonging to the owner of the house. He disconnected the security system. The owner of the house went to the home and confronted the defendant. The defendant told the owner that he believed the house belonged to the defendant. The defendant was arrested. He left the house but returned several months later. The owner of the house observed the defendant on a security camera trying to break a window with a rock but he was

13

unsuccessful. (*Myles*, *supra*, 89 Cal.App.5th at pp. 717-718) The defendant in *Myles* presented evidence—his own testimony and testimony of a clinical psychologist who interviewed the defendant—that the defendant suffered from a mental disorder, which caused him to experience delusions and made him believe the house belonged to him. (*Id.* at pp. 720-723.)

The appellate court decided *Myles* on instructional error but also considered whether there was sufficient evidence presented to support the charges of burglary and attempted burglary. It found, "Although some of this evidence was also consistent with an innocent state of mind, for purposes of substantial evidence review, we are not permitted to draw inferences contrary to the verdict." (*Myles*, *supra*, 89 Cal.App.5th at p. 740.) Further, despite the defendant's own testimony regarding his delusions, and the doctors' testimony, the court found "we do not reweigh credibility or resolve conflicts in the evidence." (*Ibid.*)

"Reviewing the sufficiency of evidence . . . necessarily calls for analysis of the unique facts and inferences present in each case, and therefore comparisons between cases are of little value." (*People v. Rundle* (2008) 43 Cal.4th 76, 137-138, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) Moreover, the findings in *Myles* support the jury's conclusion in this case to disregard defendant's claims that he was suffering from delusions that the house belonged to his stepfather.

Here, the evidence established that defendant was seen on camera entering the sunroom attached to the house and tried to open the sliding glass door. He then went to the backyard and repeatedly tried to break down the back door. Defendant took time to find different objects to assist him in breaking the door. The fact that he did not break a window or disarm the security system as in *Myles* does not mean there was insufficient evidence of burglary and attempted burglary. The evidence supports that defendant had the intent to enter the house to commit theft and we do not reweigh the evidence.

Further, evidence of defendant's mental illness presented by the two doctors did not establish that at the time defendant went to Homeowner's house, he was suffering from a mental illness causing delusions. Dr. Jones only stated that, when he saw him in jail, defendant was in a manic state. He had no opinion as to defendant's mental state at the time of the crime. Dr. Valle testified that he had no idea when defendant began having symptoms of his unspecified psychosis. Further, symptoms could change from day to day. Dr. Valle stated that defendant would still be capable of lying. The testimony of the doctors did not establish that defendant was suffering from delusions at the time he entered into Homeowner's property and the jury could reject defendant's evidence.

Based on the foregoing, the jury reasonably concluded that defendant had the intent to commit theft when he entered the sunroom and tried to break down the garage door. Defendant's claims to the contrary are rejected.

## DISPOSITION

The judgments in superior court case Nos. BAF2200473 and BAF2200506 are affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

16